UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REBECCA L. WOODS,<br>    1622 Mount Eagle Place<br>    Alexandria, Virginia 22302,<br><br>        Plaintiff,<br><br>    v.<br><br>STEPHEN L. JOHNSON,<br>    Administrator, United States<br>    Environmental Protection Agency,<br>    401 M Street, S.W.<br>    Washington, DC 20460,<br><br>        Defendant. | Civil Action No. _____ |

# COMPLAINT
### (Employment Discrimination and Retaliation)

### Introduction

1.  Plaintiff Rebecca L. Woods brings this civil action pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e-2 through 2000e-16(c) and § 1981a, and the Age Discrimination in Employment Act, as amended ("ADEA"), 29 U.S.C. § 633a, because she was denied a promotion to a GS-14 Environmental Protection Specialist position in the Toxics and Pesticides Enforcement Division of the Environmental Protection Agency based on her age and sex and because, after she filed an administrative claim of discrimination, her management retaliated against her by unreasonably delaying her request to

work from home one day a week (and providing false reasons for this delay) although this benefit was granted to many other employees in her division.

## Jurisdiction

2.  This Court has jurisdiction over the subject matter of this civil action pursuant to 42 U.S.C. § 2000e-16(c) and 29 U.S.C. §§ 633a and 216(b), plaintiff having fully exhausted her available administrative remedies as follows: by having timely lodged formal administrative complaints of the employment discrimination and retaliation at issue here with the appropriate office at the U.S. Environmental Protection Agency -- EPA Admin. Complaint No. 2004-0042-HQ (as amended); EEOC No. 100-2005-00418X -- in which a final agency decision was issued by the Environmental Protection Agency's Office of Civil Rights in a "Final Agency Order" on May 19, 2006, was received by plaintiff's counsel on May 23, 2006 -- which is within 90 days of the filing of the instant complaint initiating this civil action.

## Venue

3.  Venue is proper in this judicial district as the conduct giving rise to the claims made herein occurred at the headquarters of the U.S. Environmental Protection Agency, which is located in Washington, D.C., plaintiff works for the U.S. Environmental Protection Agency in this judicial district and her personnel records are maintained here.

## Parties

4.  Plaintiff Rebecca L, Woods (hereinafter "Ms. Woods" or "plaintiff") is a female citizen of the United States and of the State of Virginia, who is now 57 years of age (having been born on August 13, 1949). At all times relevant to the allegations in this complaint and currently she has been employed by the U.S. Environmental Protection Agency in Washington, D.C., as an

Environmental Protection Specialist (Series GS-0028). She has been in the Toxics and Pesticides Enforcement Division since 1994 when that unit was created, and has served as an Environmental Protection Specialist (Series GS-0028) since 1987.

5. Defendant Stephen L. Johnson is the Administrator of the U.S. Environmental Protection Agency (hereinafter the "EPA"), and as such is the head of that organization, which is an independent agency within the Executive Branch of the government of the United States that has had more than 500 employees in at least 20 calendar weeks in each year since 1995. As such, defendant Johnson is responsible for personnel actions, omissions and practices within the EPA. He is here sued only in his official capacity as Administrator of EPA.

## Statement of Facts

6. Ms. Woods is a 57 year-old female who has worked at the EPA for over 28 years. She has worked as an Environmental Protection Specialist at the GS-13 level for over 19 years -- since 1987. During this time period, she has repeatedly asked to be considered for a promotion to the GS-14 level, but has never received a promotion despite her ever-expanding duties, excellent evaluations, and numerous performance awards.

7. When Ms. Woods first became a GS-13 level Environmental Protection Specialist in 1987, she worked in the Office of Pollution Prevention and Toxics ("OPPTS"). In 1989, she applied for and was selected to work as a GS-13 Environmental Protection Specialist in the Office of Compliance Monitoring ("OCM"). When the EPA reorganized in 1994, OCM (and Ms. Woods aboard) was absorbed into EPA's Office of Enforcement, Toxics, and Pesticide Enforcement Division ("TPED"). This new division is divided into the Eastern and Western Branches. After the reorganization, Ms. Woods was initially assigned to the Western Branch of

TPED and continued to be supervised by the same immediate supervisor she had reported to in OCM, Gerald Stubbs. In 2000, Ms. Woods was reassigned to the Eastern Branch of TPED, and Carl Eichenwald became her supervisor.

8. TPED's activities (like those of OCM before its creation) involve three statutory areas of enforcement: The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), Toxic Substance Control Act (TSCA) and the Emergency Planning and Community-Right-To-Know-Act (EPCRA).

9. The Position Description (PD) for a GS-14 Environmental Protection Specialist in TPED lists as a qualification for the GS-14 position "a thorough knowledge of EPCRA, FIFRA, and TSCA" and also indicates that a GS-14 Environmental Protection Specialist serves as a national expert for FIFRA, TSCA, and EPCRA. Moreover the PD for the GS-14 indicates that a GS-14 handles "national enforcement initiatives" and "acts as a leader for a team of Office of Regulatory Enforcement and Office of General Counsel attorneys, technical specialists...and other staff...to develop team strategy." Over the course of Ms. Woods' career as an Environmental Protection Specialist GS-13 in the TPED (and its predecessor OCM) she had taken on all these responsibilities.

10. In 1990, because of her experience and level of expertise as an Environmental Protection Specialist GS-13, Gerald Stubbs selected Ms. Woods to serve as one of two the team leader for other employees in the OCM, adding a paragraph to her GS-13 PD which indicated that as the "senior level staff person" she serves as "a leader of a team of employees. . . .providing technical and administrative guidance to members of the team." In this capacity, from 1991 and thereafter, she reviewed the work of and gave technical guidance to other Environmental

Protection Specialist, including Tony Ellis and Brian Dyer, two young males in the unit. In fact, as Team Leader in 1991, Ms. Woods participated in the hiring of Mr. Dyer and played an integral role in his training. During this time period, Mr. Stubbs frequently asked Ms. Woods to serve as Acting Branch Chief in his absence, and at one point she was asked to serve as Acting Division Director. The 1994 reorganization creating TPED changed this arrangement -- although Ms. Woods continued to serve as a project Team Leader thereafter. In approximately 1995, because she was already working at the GS-14 level, Mr. Stubbs recommended that Ms. Woods be promoted to the GS-14 level. Despite this recommendation, Ms. Woods did not receive a promotion at that time due to claimed resource constraints.

      11.     In 1995 or 1996, upper management replaced the project team leader system in TPED with a partner system wherein attorneys and non-attorneys were paired together to work within a specific regulatory area. Under this new system, Ms. Woods partnered with attorney James Handley and worked on FIFRA enforcement and the Asbestos Hazard Emergency Response Act (AHERA) under TSCA. In approximately 1999, Ms. Woods also began to work with the EPCRA 313 Community-Right-To-Know program, paired with with attorney Tom Marvin. In this assignment, Ms. Woods served as the national expert and obtained substantial work experience in each of the three statutory programs enforced by TPED. No other non-attorney in TPED (except a GS-15 Environmental Protection Specialist) had substantial work experience and knowledge in each of these three statutory areas, and certainly neither Mr. Dyer nor Mr. Ellis had substantial experience or technical knowledge in all three statutory areas. In sum, Ms. Woods served as a national expert for EPA in TSCA, FIFRA, and EPCRA.

12.     In 2000, when EPCRA 313 activities were reassigned to the Eastern Division of TPED which was under the Supervision of Mr. Eichenwald, Ms. Woods consented to be transferred to this branch. Under Eichenwald, Ms. Woods' responsibilities continued to increase. Although it was unusual for an Environmental Protection Specialist to oversee a program area without an attorney partner, Ms. Woods took on sole responsibility for two national level programs: the AHERA TSCA and the EPCRA 313 program. Although Mr. Eichenwald was well aware that Ms. Woods had sole responsibility for these national level programs, he did not assign another attorney to work with her. Neither Mr. Dyer nor Mr. Ellis handled national level programs on their own, both being paired with an attorney in all their program assignments.

13.     Throughout her time under his supervision, Ms. Woods made it known to Mr. Eichenwald that she would like to be considered for a GS-14 promotion. Ms. Woods spoke to Mr. Eichenwald about the possibility of a promotion in 2000 and then again in November of 2003, when she learned that, because of a buy-out, GS-14 positions could become available in TPED. On both these occasions, she asked that, if a GS-14 position became available for TPED, she be given the chance to compete for a promotion in an open application process. Ms. Woods also spoke to Ann Pontius, TPED's Division Director, about the possibility for promotion to a GS-14 level on two different occasions and requested an open application process for any GS-14 position to become available in TPED.

14.     Notwithstanding her request for consideration in an open competition for any GS-14 level promotions which might become available in TPED, in late 2003 management preselected Brian Dyer and Tony Ellis, both younger male GS-13 Environmental Protection Specialists, for promotion to a GS-14 level. At the time, Ms. Woods was 54 years of age, while

-6-

Mr. Dyer was age 36 and Mr. Ellis was 39 years old. This was all done without the benefit of any open competition, nor vacancy announcement or application process as required of federal agencies under applicable civil service regulations and practices. Nor did they meet the minimum requirements of EPA's own Human Resources guidelines. Instead, these two selections for promotion to the GS-14 level in TPED were accomplished through an unannounced, secret caucus among the top TPED management who concluded that Brian Dyer and Tony Ellis were the two TPED GS-13s who would get the newly available GS-14 promotions. Mr. Eichenwald, then acting TPED Director, simply orally identified to upper EPA management that Tony Ellis and Brian Dyer had been selected to receive the two new GS-14 promotions being provided to TPED, and these two young men were promoted to the GS-14 level.

15. In February 2004, Carl Eichenwald, Ms. Woods' current Branch Chief, simply informed her that, in his branch, he believed Brian Dyer had taken on additional responsibilities and was doing well and, accordingly, he recommended Brian Dyer for one of the GS-14s, and that the other TPED Branch Chief (and Ms. Woods' former supervisor), Jerry Stubbs, had recommended Tony Ellis from his branch to get the other newly authorized GS-14 because he had taken on additional duties and was doing very well there.

16. Only after providing the recommendations for the promotion of Mr. Ellis and Mr. Dyer orally did Mr Eichenwald produce a justification for Mr. Dyer's GS-14 promotion and Mr. Stubbs produce one justifying Mr. Ellis's receipt of a GS-14 promotion. These written justifications were after the fact, and were based not on a competition but on a phony claim of "accretion of duties." These written "justifications" were then signed by upper management, although they did not comply with the EPA Human Resources policy bulletin on accretion of

duties promotions, not to mention that the entire promotion process here runs afoul of general civil service requirements.

17. The top of the promotional career ladder for Environmental Protection Specialists at EPA is and was at the time of the promotions at issue the GS-13 level. Thus, a promotion to a GS-14 is a promotion above the career ladder. To ensure an open and competitive process for these types of promotions, which are not automatic because they are above the career ladder, the EPA has issued thorough merit promotion guidelines. In the case, however, upper management in TPED failed to follow these procedures and has mendaciously attempted to justify its failure to follow the merit promotion plan as outlined in the EPA Merit Promotion Manual.

18. As noted herein above, it was not until February of 2004, two months after Mr. Dyer and Mr. Ellis had been notified about their promotions, that Mr. Eichenwald informed Ms. Woods -- during her annual performance evaluation -- that TPED had received two GS-14 promotional opportunities and that she had not been selected for either of them. During that conversation, Mr. Eichenwald gave Ms. Woods two reason for her non-selection, both utterly and demonstrably false.

19. On more than one occasion, Mr. Eichenwald made inappropriate references to Ms. Woods' age and sex. In Ms. Woods' first meeting with him as her supervisor, when she let him know that she would like to have the chance to state her qualifications for a GS-14 position, he said that he did not believe in a "beauty pageant." On another occasion, he told her that she and another older employee "were from a different era with different work ethics and training than today." On a separate occasion, he commented that "younger TPED staffers" did not check in with him as much as she and another older employee did. Finally, during a meeting which Ms.

Woods attended with Mr. Eichenwald, he laughed at an insulting comment he made to Ms. Woods about her age when she was the oldest person attending the meeting.

20. Mr. Eichenwald does not limit his disdain for older female workers to insulting and inappropriate comments. He also favored his younger and/or male subordinates in TPED over his older female subordinates in meetings and briefings (excluding older female staff), in more freely allowing them to work from home as part of their Flexiplace agreements, and in assigning female staff more administrative (as opposed to substantive) tasks. He has even been known to act disrespectful to his female Associate Director. Mr. Eichenwald also frequently attended all male coffee hours in Mr. Ellis' office, a gathering to which no female staff member has ever been invited or attended. Mr. Eichenwald's bias favoring his younger male subordinates was perhaps most evident the day he sent out an e-mail entitled "Bring out your dead" with the written text "my division collapses around me" when three of his younger male employees were out for the day.

21. On February 18, 2004, Ms. Woods notified an EEO officer about her sex and age discrimination complaint regarding the non-selection for one of the new GS-14 positions in TPED. The EEO Counselor in charge of attempting an informal resolution of Ms. Woods' claim prior to issuing her final report on March 24, 2004, indicates she interviewed Mr. Eichenwald about Ms. Woods' EEO complaint (a fact that Mr. Eichenwald concedes). Shortly after the informal mediation failed, Ms. Woods submitted an application to Mr. Eichenwald requesting Thursdays as her permanent leave day under "Flexiplace" -- a benefit provided to employees under EPA's Bargaining Agreement which permits them to work at an alternative work location other than their official work station as long as their work is portable. While other employees in

TPED had been regularly given permission to take permanent Flexiplace days, and while earlier Mr. Eichenwald had given episodic approval to Ms, Woods to take Flexiplace days (meaning she periodically could request to work from home), and although the EPA's Memorandum regarding the procedure for receiving Flexiplace approval requires a supervisor to respond to an employee's request in writing within fifteen calendar days from receiving that request, Ms. Woods did not even receive a timely response to her permanent Flexiplace request from Mr. Eichenwald. After not receiving a response from Mr. Eichenwald for over three weeks, Ms. Woods e-mailed him on May 20, 2004, asking him about her request. She still received no response. After two more weeks passed, Ms. Woods again e-mailed Mr. Eichenwald on June 3, 2004 asking about her Flexiplace request. Once again there was no response forthcoming from Mr. Eichenwald. After almost three months had passed since her initial request for a permanent Flexiplace day had been submitted without a response from Eichenwald, Ms. Woods requested that her complaint of discrimination be amended to include retaliation as an additional claim based on the denial of a Flexiplace leave day.

22. Mr. Eichenwald further demonstrated his retaliatory animus against Ms. Woods in February of 2006 when, for no reason, while she was on a detail to the National Program Chemicals Division, he approached her detail supervisor and informed that person that Ms. Woods had filed an EEO complaint against him (Mr. Eichenwald). Ms. Woods wished to extend her detail in that Division, a preference of which Mr. Eichenwald was aware, and his unwarranted and wholly inappropriate revelation to her detail supervisor could have made trouble for her in that division or even sabotage her chances to extend her time on the detail. In any event, the action caused her no little anxiety.

**Statement of Claims**

**Claim I -- Discrimination Based on Sex/Age**

23. The disparate treatment accorded plaintiff by management officials within TPED as set forth above in paragraphs 6 through 20, constitutes intentional unlawful discrimination based on her sex and her age (a female who is older), and as such constitutes a violation of plaintiff's right to a work environment free of unlawful discrimination under both Title VII and the ADEA.

24. As a direct and proximate result of the defendant's unlawful sex plus age discrimination, plaintiff has suffered and continues to suffer economic losses, lost pay and bonuses and other benefits, lost career opportunities and career damage, and both personal and professional humiliation, as well as general emotional pain.

**Claim II -- Retaliation**

25. The disparate treatment accorded plaintiff by management officials within TPED, as set forth above in paragraphs 21 and 22, also constitutes intentional unlawful retaliation because she had previously raised and pursued a claim of unlawful sex/age discrimination (*i.e,* : the claim set forth in paragraphs 6 through 20 above).

26. As a direct and proximate result of the defendant's unlawful retaliation, plaintiff has suffered and continues to suffer a loss of benefits, both personal and professional humiliation, as well as anxiety and general emotional pain.

**Prayer for Relief**

WHEREFORE, plaintiff prays that this Court enter judgment in her favor and against defendant on the claims brought herein and provide her with the following relief:

a. Award plaintiff compensatory damages against defendant in the maximum dollar amount allowable under Title VII, with interest thereon;

b. Order defendant to promote plaintiff to a GS-14 Environmental Protection Specialist (at the appropriate within-grade pay level) retroactive to December 2003.

c. Order defendant to provide plaintiff with full back pay (with interest thereon) and other benefits (including within-grade pay increases, statutory pay increases, bonuses, etc., to accord with the retroactive promotion to the GS-14 level;

d. Order defendant to correct EPA's records, including plaintiff's Official Personnel Folder ("OPF") to accord with the jury's verdict and the equitable relief awarded plaintiff by the Court;

e. Enjoin defendant from discriminating or retaliating against plaintiff in the future;

f. Award plaintiff her costs of filing and prosecuting this civil action and the administrative EEO complaint that preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 2000e-5(k);

g. Award such other and further relief as the Court may deem just and appropriate.

## Jury Demand

Plaintiff hereby requests a jury trial on all issues of fact, including the award of compensatory damages and the amount to be awarded.

                                                  Respectfully submitted,

_____

David H. Shapiro
D.C. Bar #961326
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C. 20005
Tel. 202-842-0300
Fax 202-842-1418
email - dhshapiro@swickandshapiro.com

Attorneys for Plaintiff

## Verification

I hereby verify under pain and penalty of perjury that the facts set forth in the foregoing complaint are true and correct to the best of knowledge, information, belief, and recollection.

_____

Rebecca L. Woods