Woods v. Johnson,
Civil Action No. 06-1460(HKK)
Ex. 11

## Declaration of Carl Eichenwald

I, Carl Eichenwald, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1. I presently served as the Branch Chief of the Eastern Branch of the Toxics and Pesticides Enforcement Division (TPED) in the Office of Civil Enforcement (OCE) in the Office of Enforcement and Compliance Assurance (OECA). The Office of Regulatory Enforcement (ORE) was redesignated the Office of Civil Enforcement in February 2005 without change in organization. I have served in such capacity since May 2000, and at all times relevant to Ms. Woods claims of discrimination/retaliation herein at issue.

2. My immediate supervisor at all times relevant to Ms. Wood's EEO complaint herein at issue was Ann Pontius, the former TPED Division Director, and my second line supervisor during the same time frame was Walker Smith, then, and still, the OCE Office Director.

3. At the time that I assumed the role of Chief of the Eastern Branch, Ms. Woods was formally assigned to the Western Branch under the immediate supervision of Gerald Stubbs, Chief of that Branch. The bulk of Ms. Ms. Woods' responsibilities, however, were those over which I had programmatic oversight, and it was I, rather than Mr. Stubbs, who had greater opportunity to be familiar with her work.

4. At the time that I assumed the role of Chief of the Eastern Branch, Ms. Woods' matrixed supervision was not unique, in that TPED had a number of employees who, based on the nature of their work and which Branch Chief had oversight responsibilities with respect to such work, were assigned to a different supervisor.

5. Shortly after my assumption of the Easter Branch Chief responsibilities, Mr. Stubbs and I, with Ms. Pontius' concurrence, and with the consent of all affected staff, realigned the TPED personnel so that each Branch Chief would have as his immediate subordinates those individuals performing work subject to his oversight. It was thus that Ms. Woods came to be formally assigned to the Eastern Branch in October 2000. A number of other TPED personnel were formally reassigned at such time as well.

6. By the time of the early calendar year 2004, non-attorney GS-14 selection process that Ms. Woods challenges as discriminatory, I had had substantial opportunity to assess the relative promotion merits of everyone in my Branch, including Ms. Woods. In addition, because some of my Branch personnel had been in Mr. Stubbs' Branch and vice-a-versa, he and I were reasonably familiar with the promotion worthiness of individuals in our sister Branch.

7. Pursuant to an Agency decision to allow buyouts at the end of calendar year 2003 and the beginning of calendar year 2004, four non-attorney GS-14 ORE personnel elected to leave the Government. Their departure provided ORE with "ceiling" room to promote an equal number of non-attorney GS-13s to the next level.

8. I understand that ORE operates under a strict limitation on the number non-attorney GS-14 employees that it can have in its ranks. Thus, even were the office inclined to promote such personnel, it could not do so if it was at the ceiling number, which I understand to be 35. It is my understanding that prior to the early outs noted in paragraph 7, above, ORE was at its ceiling of 35.

9. In anticipation of promotion opportunities that might occur after the buyouts, I, Gerald Stubbs, Ann Pontius, and Stephanie Brown caucused and concluded that Brian Dyer and Tony Ellis were the two best qualified TPED employees.

10. The TPED management team noted in paragraph 9, above, considered all six of the Division's promotion eligible non-attorney GS-13s, including Ms. Woods, who we ranked by consensus as the fourth best candidate. Messrs. Dyer and Ellis were recognized by each member of the TPED management team as the run-away most deserving promotion candidates.

11. In December 2003, I was acting as the Division Director in Ann Pontius' absence. In that capacity, I was asked by Kia Logan, the Team Leader of ORE's Resource Management Team, to identify those non-attorney GS-13 personnel whom TPED considered to be their most deserving promotion candidates. Consistent with the TPED managers' earlier discussions, I submitted both Messrs. Dyer's and Ellis' names. Had Ms. Smith chosen to allot TPED but a single promotion, Ms. Pontius would have had to decide between Mr. Dyer and Mr. Ellis, which would have been a difficult decision. Fortunately, it was not one that she was forced to make.

12. It was not clear to TPED management how many promotions of the four available ones might be offered to our Division. I understand that this was a decision that Ms. Smith made, after consulting with her Division Directors. As it turned out, Ms. Smith chose to allocate two of the GS-14 promotions to TPED.

13. In evaluating who among the TPED non-attorney GS-13 staff was the most qualified for a promotion, one critical consideration was how independently such personnel worked. It was my experience supervising both Ms. Woods and Mr. Dyer that he operated with substantially more autonomy than she did.

14. Ms. Woods rather regularly discussed her work with me, and it was my impression that she did so in order to solicit my input and to assure herself that her judgment agreed with mine, including matters of routine and ordinary importance.

15. Mr. Dyer, on the other hand, did not interact with me anywhere near as substantially, and I always felt that he functioned with far greater independence. His judgment and instincts impressed me as being invariably excellent, and I perceived Mr. Dyer, on this basis, as well as on his general technical competency, and on his rapport with EPA colleagues and the external community alike, as being the individual in the Eastern Branch most deserving of a GS-14 promotion.

16. Gerald Stubbs, my counterpart in the Western Branch, who had had significant opportunity to supervise Ms. Woods in the past and was well familiarized with her qualifications for promotion, found Tony Ellis to be his Branch's most deserving promotion candidate. It is my understanding, based on discussions that Mr. Stubbs and I had concerning who he regarded most favorably that he also considered independence a critical component of the promotion calculus. It is also my understanding that Mr. Stubbs felt that Mr. Ellis was far and away his Branch's best promotion candidate.

17. I understand that Ms. Woods has questioned the integrity of the selection process, insofar as TPED did not advertize the GS-14 "jobs" and solicit applications. It is my understanding that TPED did not have authorization to hire new personnel, and that announcing a job publicly within TPED or soliciting interest from a larger group outside of TPED is not permitted without a full-time equivalent slot to hire into. Thus, I understood that the only route available to process a promotion would be by accretion of duties.

18. Further, even if a full-time-equivalent was available and a competitive process was used, I do not believe the pool of applicants could be limited smaller than the full Office of Enforcement and Compliance Assurance. Thus, I believe the number of persons competing for the position would be greater and it would have been possible Mr. Ellis, Mr. Dyer or Ms. Woods could have sorted further down an expanded list.

19. In April 2003, Ms. Woods submitted to me an application to participate in the Agency's Flexiplace program. At the time that she submitted her request, she identified Wednesday as the day that she would like to work from home. Because our Branch already had a number of personnel working from home that day, I was not comfortable authorizing Ms. Woods to do so also.

19. Apparently, at some point subsequent to her initial submission, Ms. Woods revised her Flexiplace request and asked to be allowed to work from home on Thursdays. I did not timely become aware of such change, and I was not diligent in addressing the Flexiplace matter. Between the routine crush of other business and my ignorance of Ms. Woods' revision making her request unobjectionable, our Division let this matter fall through the cracks and languish for too long.

20. Later than would have been desirable, I did authorize Ms. Woods to participate in the Flexiplace program, and she did so, at least until she commenced a detail in an office outside of the Branch.

21. While my and the Division's delinquency in addressing Ms. Woods' Flexiplace application was regrettable, it was not intentional. I was not motivated to defer responding to her request by any discriminatory or retaliatory animus, rather I was distracted by the press of other important business, which had significant programmatic implications and which caused me to fail to appreciate that Ms. Woods had revised her application.

22.  I absolutely did not discriminate against Ms. Woods or any other candidate in the GS-14 selection process that resulted in Messrs. Dyer and Ellis being promoted.

23.  Furthermore, my failure to act as quickly as would have been preferable to authorize Ms. Woods' Flexiplace participation was not motivated in any way by discrimination or a retaliatory animus.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on January 10, 2006.

_____
Carl Eichenwald, Chief
Eastern Branch
Toxics and Pesticides Enforcement Division
Office of Civil Enforcement