## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **REBECCA L. WOODS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **V.** ) | **Civil Action No. 06-1460 HHK** |
| ) | |
| **STEPHEN L. JOHNSON,** ) | |
| **Administrator, Environmental** ) | |
| **Protection Agency,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Rebecca Woods contends that she was denied a promotion to a GS-14 Environmental

Protection Specialist position in the Toxics and Pesticides Enforcement Division (TPED) of the

Environmental Protection Agency (EPA) based on her age and sex. TPED has continued to pay

and grade Ms. Woods as a GS-13 employee despite the fact that her duties and responsibilities

have been the equivalent of a Grade 14 employee since 1995. TPED management has refused to

give Ms. Woods an accretion of duties promotion and, when a vacancy became available,

secretly promoted two younger male employees with far less knowledge, skills and abilities than

Ms. Woods. Indeed, the evidence shows that Ms. Woods' supervisor, who favored younger male

employees and commented that Ms. Woods was from a "different era with different work ethics,"

violated EPA's merit promotion policy by preselecting the younger males before the Grade 14

vacancies became available. Then, when the Grade 14 vacancies became available, instead of

following EPA's policy requiring competitive selections based on merit, the younger males were

promoted without competition; Ms. Woods was denied an opportunity to compete against them. After Ms. Woods complained about this discriminatory non-promotion, her supervisor retaliated against her by refusing to act on her request to work from home one day a week, although this benefit was routinely granted to other employees who had not complained of discrimination.

In its current motion, the EPA contends that Ms. Woods' case should be dismissed because the alleged discriminating officials have asserted that she was not working as independently as a Grade 14 employee. Defendant's Motion for Summary Judgment (Def. Mot.) at 21-23. The EPA also asserts that Ms. Woods' retaliation claim should be dismissed because the denial of her request to participate in the Agency's Flexiplace was "not an adverse action for purposes of sustaining a claim under Title VII," Def. Mot. at 4, 28-29, thus ignoring the Supreme Court's holding in *Hishon v. King & Spaulding*, 467 U.S. 69, 74 (1984).

These arguments fail because there are significant issues of fact surrounding the veracity of the explanations provided by the Agency for its actions. First, there is evidence that Ms. Woods was working at the GS-14 level. She independently ran two programs and served as a National Level Expert in all of the three statutory areas enforced by TPED, an important qualification for the promotion at issue that neither of the younger male selectees possessed. Furthermore, in 1995, her supervisor requested her promotion to a Grade 14 based upon an accretion of duties. At the time, she was told promotions had been "frozen."

There is also evidence that the responsible EPA managers have falsely claimed that they could not allow competition for the promotions, as required by the EPA Merit Promotion Selection Process. EPA claims that it could not allow competition for the GS-14 positions because due to a hiring "freeze," it could not post a Vacancy Announcement soliciting

applications from outside the EPA which would cause the EPA to exceed authorized staffing levels. However, the EPA policy allows the competitive area for promotions to be restricted to the EPA Division level which would have limited the competition to TPED employees. Limiting the competitive area to TPED employees would not have increased the number of EPA employees, but it would have allowed Ms. Woods to compete for the promotions.

Finally, as established by Supreme Court in *Hishon*, an employer's refusal to provide an employee with a benefit is sufficiently material to warrant the protection of Title VII. Because participation in the alternative work place day was contractually promised to Ms. Woods, the refusal to honor that obligation is actionable.

For all of these reasons, the EPA's motion for summary judgment must be denied.

## FACTS

### I.    Background.

Rebecca Woods is a 58 year-old female who has worked at the Environmental Protection Agency (EPA) for over 30 years. Ms. Woods began her work as a GS-13 Environmental Protection Specialist in 1987 in the Office of Pollution Prevention and Toxics (OPPTS). In 1989, she was selected to work as a GS-13 Environmental Protection Specialist in the Office of Compliance Monitoring (OCM). The OCM and TPED enforce three statutes: The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), Toxic Substance Control Act (TSCA) and the Emergency Planning and Community-Right-To-Know-Act (EPCRA). Plaintiff's Exhibit (PX) 2 (Pontius Depo.) at 22.

In the OCM, Ms. Woods' first line supervisor was Gerald Stubbs. When the EPA reorganized in 1994, Ms. Woods' office was absorbed into the Office of Enforcement, Toxics,

3

and Pesticide Enforcement Division (TPED). This division is divided into the Eastern and Western Branches. After the reorganization, Ms. Woods was assigned to the Western Branch of TPED and continued to be supervised by Mr. Stubbs. However, in 2000, she was reassigned to the Eastern Branch, and Carl Eichenwald became her supervisor. PX 1 (Woods Declaration) at ¶¶ 2,8, 9.

**II.     Ms. Woods Worked at the GS-14 Level But Remained a GS-13.**

The Position Description (PD) for a GS-14 Environmental Protection Specialist indicates that the incumbent serves as a national expert for FIFRA, TSCA, and EPCRA and must have "a thorough knowledge of EPCRA, FIFRA, and TSCA." PX 3, ROI[1] Tab F-7 at 7, 10. The PD also notes that a GS-14 "acts as a leader for a team of Office of Regulatory Enforcement and Office of General Counsel attorneys, technical specialists...and other staff...to develop team strategy" and handles "national enforcement initiatives." *Id*. at 8. As detailed below, Ms. Woods was assigned all these responsibilities. *See* PX 1, Attachment D (Summary of Work and Responsibilities).

**A.     Ms. Woods Served as a National Expert For FIFRA, TSCA, and EPCRA.**

In 1996, Ms. Woods partnered with attorney James Handley and worked on FIFRA enforcement and the Asbestos Hazard Emergency Response Act (AHERA) under TSCA. PX 6 (Handley Decl.) at ¶ 3 (GS-14 attorney stating that Ms. Woods knew more than he did about TPED's enforcement regulations). In approximately 1999, she also began working on the EPCRA 313 Community-Right-To-Know program. Thus, as of 1999, she served as the national expert for FIFRA, TSCA, and EPCRA, which is a noted requirement for a GS-14 Environmental

---

[1] "ROI" refers to the "Report of Investigation," i.e., the investigative file compiled by the EPA during the administrative proceedings.

Protection Specialist.[2]  *Id.* at ¶ 14; PX 7 (Clark Decl.) at ¶ 2 (Kathy Clark, a GS-15 attorney,

states that she frequently asked Ms. Woods questions about TPED enforcement regulations

because Ms. Woods was extremely knowledgeable in these areas).  Neither Mr. Dyer nor Mr.

Ellis had expertise in all three statutory areas.  *See* PX 5 (Dyer Depo.) at 23-29 (admitting that he

had never worked with EPCRA, and handled only one case under TSCA); PX 4, Ellis Depo. at

32 (testifying that he has not dealt much with EPCRA or FIFRA); PX 8 (Eichenwald Depo.) at

34-36 (admitting that most employees under his supervision had not done TSCA Asbestos work

or EPCRA work like Ms. Woods).

> **B.     Ms. Woods Served as a Team Leader Where She Provided Guidance and
> Reviewed the Work of Junior Team Members, Including the Two Younger
> Males who were Later Promoted Instead of Her.**

In 1990, Mr. Stubbs selected Ms. Woods to serve as the team leader in the OCM.  PX 1 at

¶ 3.  Mr. Stubbs also added a paragraph to Ms. Woods' GS-13 PD stating that as the "senior level

staff person" she served as "a leader of a team of employees. . . .providing technical and

administrative guidance to members of the team."  PX 1, Attachment A.  The new position

description also indicated that because of Ms. Woods' technical expertise, she would review the

work of other employees:

> Specifically, the team leader will work with the team members to develop work
> plans for projects assigned by the Branch Chief, will review outputs of the team
> members for technical accuracy, and serve as the principal advisor to the Branch
> Chief on technical matters in their areas of expertise.

---

[2]  Mary McDonnell, a GS-15 Environmental Protection Specialist, was the only other
non-attorney who had substantial work experience and knowledge in each of these three statutory
areas. She had been promoted to GS-14 and GS-15 prior to Mr. Eichenwald becoming Branch
Chief.  PX 8 (Eichenwald Depo.) at 16; PX 9, ROI Tab F-12 (List of employee promoted listing
manager).

*Id.* As a Team Leader in the OCM, Ms. Woods provided guidance to Mr. Ellis. PX 1 at ¶ 4;
*accord* PX 4 (Ellis Depo.) at 50 (agreeing that Ms. Woods served as his team leader). In 1991,
Ms. Woods participated in the hiring of Mr. Dyer and played an integral role in his training. *See*
PX 1 at ¶ 4 and Attachment B ("When training Mr. Dyer I provided him with feedback on his
draft documents and gave him templates I had developed for him to use as models with his
work."); *accord* PX 5 (Dyer Depo.) at 50, 62 (testifying that Ms. Woods was his team leader
between 1991 and 1994, and that she was involved in his hiring). During this time period, Mr.
Stubbs frequently designated Ms. Woods as the Acting Branch Chief in his absence, and at one
point she served as Acting Division Director supervising both Mr. Dyer and Mr. Ellis. *See* PX 1,
Attachment C; *see also* PX 5, Dyer Depo. at 63-64 (indicating that Ms. Woods had served as
acting Branch Chief and that he had never been asked to serve as acting Branch Chief).

By 1995, Mr. Stubbs believed that Ms. Woods was working at the GS-14 level and
recommended her promotion. PX 1 at ¶ 6; PX 17 (Stubbs Depo.) at 64-66 (agreeing that he
submitted a request for her promotion in 1995 based upon an accretion of duties). Despite her
supervisor's support and her ever-expanding duties, excellent evaluations, and numerous
performance awards, she was not promoted. PX 1 at ¶¶ 2, 6 and Attachment D (Summary of
Work and Duties and Listing of Honors).

### C.    Ms. Woods Had Sole Responsibility for Two National Enforcement Initiatives.

Ms. Woods' responsibilities continued to increase after her transfer to the Eastern
Branch. In 2000, the attorney working with her on TSCA left the Agency, and she began to
manage that national program by herself. PX 1 at ¶ 13; PX 6 (Handley Decl.) at ¶¶ 2, 5. Then, in
2001, the attorney managing EPCRA 313 went on detail, and Ms. Woods added sole

6

management of that national program to her GS-14 responsibilities, although she continued to be graded as a 13. PX 1 at ¶ 12; *see also* PX 24, ROI Tab B at 25 (Justification for Monetary Award) (indicating that Ms. Woods was in charge of the EPCRA program while Mr. Marvin was on detail). Ms. Woods was the only Environmental Protection Specialist to oversee two programs without an attorney partner. PX 1 at ¶ 12. Mr. Eichenwald praised Ms. Woods for her independent work on these national initiatives and did not feel the need to assign an attorney to work with her. *Id.* at ¶¶ 12,13; *see also* PX 2 (Pontius Depo.) at 91 (acknowledging that after Mr. Marvin left the EPA in 2003 no attorney was assigned to work with Ms. Woods and that EPCRA 313 is "an important program").

Neither Mr. Dyer nor Mr. Ellis handled national level programs on their own. Mr. Dyer was teamed with attorney Dean Ziegel for his import/export pesticide work under TSCA. PX 5 (Dyer Depo.) at 28, 31. Mr. Ellis worked with attorney Mark Gravey on the core TSCA program. *See* PX 4 (Ellis Depo.) at 36.

## III.    The EPA Merit Promotion Policy.

The EPA Merit Promotion Program requires that "applicants be evaluated, considered, and selected on the basis of merit." PX 18, EPA Merit Promotion Manual, Chapter (Ch.) 1, ¶ 3 at 1-1. To implement this policy, the EPA has established competitive procedures which provide for the posting of a Merit Promotion Announcement. *Id.,* Ch. 3, ¶ 3.b. at 3-3, Figure 2. While some vacancies can be filled by considering candidates nationally, EPA managers may limit the area of consideration to current employees within a division, so long as there is an adequate pool to insure competition. *Id.*, Ch. 3, ¶ 2 at 3-2. ("The minimum area of consideration will be an organizational unit, no less than a division or laboratory, which is sufficient to attract at least two

highly qualified candidates for promotion consideration."). The Merit Promotion Announcement must include Quality Ranking factors so that the knowledge, skills, and abilities of an applicant can be assessed in light of the requirements of the position. See *id.,* ¶ 3.f. at 2-2. The Quality Ranking Factors are used to review the applications and to distinguish the "Best Qualified" candidates from lesser qualified or unqualified candidates. *Id.,* Ch.3, ¶ 5., at 3-5 through 3-8. The "Best Qualified" candidates are then referred to the selecting official for an interview. *Id.,* Ch.3, ¶ 6. at 3-8 through 3-10. Based upon the information available, the selection official is required to select the best qualified candidate. *Id.,* Ch.1, ¶ 3 at 1-1, 5 U.S.C. § 2301.

In exceptional circumstances, EPA policy allows non-competitive promotions, also known as "Accretion of Duties" promotions. *Id.,* Ch.3, ¶ 1.b.(1)b. at 3-1. However, the use of Accretion of Duties promotions as a means to avoid the requirements of the Merit Promotion Plan or for reasons of expediency is explicitly prohibited. PX 12, ROI Tab F-6 (HR Policy Bulletin): Accretion of Duties, at 5. EPA policy strictly limits these "Accretion of Duties" promotions to circumstances where:

- the employee continues to perform the same basic functions, working for the same supervisor.
- the additional duties and responsibilities assigned to or accrued by the incumbent do not adversely affect or impact the grade controlling duties and responsibilities of the other positions within the unit.
- the accretion is supported by an analysis of the position (which may involve an audit with the employee, the employee's supervisor or other fact gathering method).

*Id.* at 1-2.

EPA policy "strongly encourages" evaluation statements. Moreover, EPA policy provides that the analysis of position may involve a desk audit. Although desk audits are not mandatory in

8

every case, EPA managers are expected to exercise sound judgment in deciding whether an audit

is necessary to determine the appropriate title, series and grade of the new, higher-graded

position. *Id.* at 2.

## IV.    Ms. Woods Seeks Promotion to the GS-14 Level Under the Merit Promotion Program.

Ms. Woods approached Mr. Eichenwald about a promotion on several occasions.  In

November of 2003, when she learned that GS-14 positions could become available in TPED

because of a buy-out, she asked him for a chance to compete in an open application process.  PX

1 at ¶¶ 8, 10, 15;  *see also* PX 8 (Eichenwald Depo.) at 111-12 (stating that he regularly

discussed a GS-14 promotion with Ms. Woods).  Ms. Woods also spoke to TPED's Division

Director, Ann Pontius, about the possibility for promotion to the Grade 14 level on two occasions

and requested an open application process for any GS-14 position in TPED.  PX 1 at ¶ 16;

*accord* PX 13, ROI Tab F-3 (Pontius Decl.12/2/04) at 5 (indicting that she was aware that Ms.

Woods was interested in being promoted to the GS-14 level and that she had asked to be

informed of the next opening at that level).

## V.    TPED Managers Circumvent the Merit Promotion Plan and Promote Two Younger Males Without Allowing Ms. Woods to Compete.

When it appeared that there would be an opportunity to promote subordinates to the

Grade 14 because of employee buyouts, TPED decided to promote Brian Dyer and Tony Ellis,

both younger male GS-13 Environmental Protection Specialists,[3] to the GS-14 level even before

---

[3]  Mr. Dyer is age 38.  PX 5 (Dyer Depo.) at 7.  Mr. Ellis is 42.  PX 9 (ROI Tab F-12).

the positions were officially available.[4]  *See* PX 23 (Eichenwald Decl. 1/10/06) at ¶ 9 ("In

anticipation of promotional opportunities that might occur after the buyouts, I, Gerald Stubbs,

Ann Pontius, and Stephanie Brown caucused and concluded that Brian Dyer and Tony Ellis were

the two best qualified TPED employees.").  Then, when TPED received notification that GS-14

positions were available, Mr. Eichenwald recommended Mr. Dyer and Mr. Ellis and not Ms.

Woods, despite her superior experience and qualifications.  PX 20 (Eichenwald Decl. ) at 7; PX

15 (Smith Decl.) at 4.  After providing these recommendations orally, Mr. Eichenwald wrote the

justification for Mr. Dyer's promotion after-the-fact based on a claimed accretion of duties which

Ms. Smith then signed.  PX 8 (Eichenwald Depo.) at 62-64.  Phyllis Harris, Deputy Assistant

Administrator, signed off on the accretion of duties promotions based on the ad hoc written

justifications.  *Id.* at 102.  Mr. Dyer and Mr. Ellis were told by their Branch Chiefs and Ms.

Pontius about their promotion in either December or January of 2004.  PX 5 (Dyer Depo.) at 42,

49; PX 4 (Ellis Depo.) at 25.  Their promotions became effective in March of 2004.  PX 8

(Eichenwald Depo.) at 109.

There were six candidates in TPED eligible for promotion to GS-14, all of whom could

have applied.  PX 19 (Pontius Decl. 12/29/05) at ¶ 9; PX 23 (Eichenwald Decl. 1/10/06) at ¶ 10;

PX 14 (Stubbs Decl.) at ¶ 15.  While TPED management claims that it considered the

qualifications of these six candidates, the fact is that management deliberately circumvented the

---

[4]  The Agency admits that the "selection process was an informal one; there was no
vacancy announcement issued, there was no scoring system, nor were any written materials
considered or generated incident to the process." PX 28 (Agency's Responses to Complainants's
First Request for Production of Documents) at 1.  Indeed, those involved can recall no particular
details about the exact number or length of these discussions.  *See* PX 8 (Eichenwald Depo.) at
49.

competitive selection process by pretending these were "accretion of duties" promotions. Mr.

Eichenwald thereby secured promotions for the young male candidates he preferred without

posting a vacancy announcement, convening a selection panel, reviewing applications, or

interviewing applicants. *See* PX 21 at 73 (e-mail indicating there were no GS-028-14 position

postings for that period).

TPED management has tried to justify its failure to follow the Merit Promotion Plan by

asserting that there was no "position" available, and, therefore, it could not have solicited interest

from outside TPED. *See* PX 19 (Pontius Decl. 12/29/05) at ¶ 17; PX 23 (Eichenwald Decl.

1/10/06) at ¶ 17 ("TPED did not have authorization to hire new personnel, and. . .announcing a

job publically within TPED or soliciting interest from a larger group outside of TPED is not

permitted without a full-time equivalent slot to hire into."). However, both Mr. Eichenwald and

Ms. Pontius admitted that TPED did receive two slots. *See* PX 20 (Eichenwald Decl.12/03/04) at

3 (The Office Director and Division Directors, discussed the issues, looked at the allocation of

the GS-14 slots among the different divisions and ultimately determined that TPED would

receive two of the four slots"); PX 2 (Pontius Depo.) at 59 ("I was given two more GS-14

slots."). Furthermore, management has not explained why it did not follow EPA's Merit

Promotion Plan by limiting the competition to those currently working in TPED. PX 18 (EPA

Merit Promotion Manual) Ch. 3, ¶ 2 at 3-2.

**VI.    EPA Advances False Reasons for Ms. Woods' Nonselection.**

It was not until February of 2004, nearly two months after Mr. Dyer and Mr. Ellis had

been notified about their promotions, that Mr. Eichenwald informed Ms. Woods that TPED had

received two GS-14 promotional opportunities and that she had not been selected for either of

them. PX 8 (Eichenwald Depo.) at 80; PX 10 (Woods Decl. 7/20/04) at ¶ 8. During that conversation, Mr. Eichenwald gave Ms. Woods two reason for her nonselection.

First, he told her that she "checked in too much." PX 10 at ¶ 8. Previously, Mr. Eichenwald had commented to Ms. Woods that "younger TPED staff" did not check in as much as Ms. Woods and Mary McDonnell, the two staff members in TPED who had worked for the government the longest. *Id.* at ¶ 9; *accord* PX 1 at ¶ 22. However, "weeks" would sometimes go by when Ms. Woods would not see her branch chief since they worked on different floors; on average, Ms. Woods only stopped by Mr. Eichenwald's office once every two weeks. *Id.* at ¶ 19; *see also* PX 6 (Handley Decl.) at ¶ 4 (EPA attorney who worked with Ms. Woods for years, observed that Ms. Woods worked independently only "consulting when necessary"). In the four years Mr. Eichenwald supervised Ms. Woods, he had never before told her that she checked in too much. PX 10 (Woods Decl.7/20/04) at ¶ 9.

Mr. Eichenwald's second stated reason for not promoting Ms. Woods was that "a work product she had prepared in November of 2003 was 'not a quality document.'" PX 1 at ¶ 19. However, Ms. Woods had followed Mr. Eichenwald's instructions for this project, turned in the assignment by the deadline and had received no negative feedback until Mr. Eichenwald sought to justify her nonpromotion three months after the fact. Moreover, Ms. Woods had completed this type of project several times in the past, and her work had always been found to be of high quality. *Id.* Additionally, others had worked on the project and submitted less information than Ms. Woods, but their work was never criticized. *Id.*

In contrast to the reasons given by Eichenwald, the primary reason Ms. Pontius gives for Mr. Dyer's and Mr. Ellis' selection is "because they [Dyer and Ellis] had already demonstrated an

ability to work at the GS-14 level." PX 13 (Pontius Decl.12/2/04) at 3-4.  However, Ms. Pontius

admitted in her deposition that Ms. Woods was working at the GS-14 level.  PX 2 (Pontius

Depo.) at 81, 89; *see also* PX 7 (Clark Decl.) at ¶3 (stating that she has worked with Ellis, Dyer,

and McDonnell, and based on her experience working with these Environmental Protection

Specialists, she does not understand why these individuals are one or two grades higher than Ms.

Woods).

      After her nonselection, Ms. Woods sought to be detailed out of TPED because she no

longer wished to work under Mr. Eichenwald.  Mr. Eichenwald would not approve her detail

because he considered her to be "too important" to his branch.  PX 10 (Woods Decl.) at ¶16; PX

8 (Eichenwald Depo.) at 91.

## VII.    Mr. Eichenwald Favors Younger Male Employees in TPED.

      Mr. Eichenwald favored his younger male staff by including them in meetings and

briefings while excluding female staff, more freely allowing male staff to work from home,

assigning female staff more clerical tasks, and disrespecting his female Associate Director.  *See*

PX 1 at ¶¶ 24-27; PX 7 (Clark Decl.) at ¶4 (stating that Mr. Eichenwald frequently interrupted

her presentations or briefings to the Office or Associate Office Directors while he did not

interrupt male employees).  Mr. Eichenwald also frequently attended all-male coffee hours in Mr.

Ellis' office--a gathering to which no female staff member was ever included.  PX 1 at ¶ 23.

And, when three of his younger male employees were out for the day he sent out an e-mail

entitled "Bring out your dead" with the written text "my division collapses around me."  *See id.*

Attachment F.

**VIII.  Mr. Eichenwald Retaliates Against Ms. Woods by Refusing to Approve her Request for an Alternative Work Location.**

EPA employees are routinely allowed to work from home.  According to the EPA's Memorandum on the Flexiplace policy, "flexiplace" days are a benefit given to employees which permits them to work at an alternative location other than their official work station as long as their work is portable.  PX 26 at 2; PX 1 at ¶ 29; PX 23 (Eichenwald Decl.1/10/06) at ¶19.

On April 28, 2004, Ms. Woods submitted an application to Mr. Eichenwald requesting Thursdays as her permanent flexiplace day.  PX 22.  Just ten days earlier, on February 18, 2004, Ms. Woods had initiated the EEO process by complaining about sex and age discrimination to the EEO Officer.  PX 21 (EEO Counselor's Report).  Mr. Eichenwald did not respond to Ms. Woods' request within the required 15 calendar days.  *See* PX 26 (EPA Memorandum on Bargaining Agreement for Flexiplace Leave) at 8 (requiring supervisor to respond to an employee's request in writing within fifteen calendar days of receiving that request).  After three weeks, Ms. Woods e-mailed him on May 20, 2004, asking him about her request.  PX 25.  Mr. Eichenwald again failed to respond.  PX 1 at ¶ 31.  The same thing happened two weeks later when Ms. Woods followed up with another e-mail to Mr. Eichenwald on June 3, 2004 (PX 25), and once again she received no response from Mr. Eichenwald.  PX1 at ¶ 31.  After Ms. Woods complained that Eichenwald's refusal to approve her flexiplace request was discriminatory and retaliatory, he approved it.

**IX.    Eichenwald Seeks To Sabotage Woods in Her New Position.**

Ms. Woods sought a detail away from the discriminatory and retaliatory environment under Mr. Eichenwald.  However, Eichenwald did his best to sabotage Ms. Woods in her new

position in the Fibers & Organics Branch.  When David Hanneman, her detail supervisor, sought

input from Mr. Eichenwald for her evaluation, Mr. Eichenwald told Mr. Hanneman that Ms.

Woods had filed an EEO complaint and that she was "tainted goods." PX 27 at ¶ 4.


## ARGUMENT

**I.      Legal Standard for Summary Judgment.**

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment

should be granted only if it is shown "that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." *Turner v. Federal Law*

*Enforcement Training Center*, --- F.Supp.2d ----, No. 04-0606, 2007 WL 4355170, at *6 (D.D.C.

2007) (*quoting* Fed.R.Civ.P. 56©).  The moving party's "initial responsibility" consists of

"informing the [trial] court of the basis for its motion, and identifying those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."

*Turner* at *6 (quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323(1986)).

If the moving party meets this burden, the burden then shifts to the non-moving party to

establish that a genuine dispute as to any material fact actually exists. *Id. (citing  Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A dispute about a material

fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), and summary

judgment should not be granted unless the nonmoving party "fails to make a showing sufficient

to establish the existence of an essential element to that party's case, and on which that party will

bear the burden of proof at trial," *Czekalski v. Peters,* 475 F.3d 360, 363 (D.C. Cir. 2007). At this stage of the proceedings, the Court must view the evidence in the light most favorable to the nonmoving party (here, Woods), draw all reasonable inferences in her favor, without making credibility determinations or weighing the evidence. *Id.* at 363 (*citing Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150 (2000)); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C. Cir.1998) (en banc).

## II.    Plaintiff has Established a *Prima Facie* Case of Sex and Age Discrimination.

To establish a *prima facie* case of disparate treatment discrimination, an employee may show that:  "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999),[5] *accord Turner* at *6 (*quoting George v. Leavitt*, 407 F.3d 405, 412 (D.C.Cir.2005)).  In promotion cases, the EEOC has held that an employee can establish a *prima facie* case of discrimination by showing:  (1) that she is a member of a protected group; (2) that the position should have been open for competition; (3) that she was qualified for the position; and (4) that the agency filled the position.  *Jarrold v. Department of the Navy*, 1988 WL 1078696, EEOC Appeal No. 1880519 (E.E.O.C. Mar 30, 1988).  The D.C. Circuit has embraced a similar flexible approach to requirements for a *prima facie* case. *Chappell-Johnson v. Powell*, 440 F.3d 484 (D.C. Cir. 2006) (holding that a plaintiff establishes a *prima facie* case by showing that she was denied an opportunity for advancement that was given to non-African American and younger employees).  As the Court of Appeals has stated, the

---

[5] Both plaintiff's sex and age discrimination cases are analyzed under the familiar *McDonnell Douglas* burden-shifting paradigm.  *Garner v. Boorstin*, 690 F.2d 1034, 1036 (D.C.Cir. 1982).

"relevant inquiry" is : "Was the plaintiff rejected for the position and a person outside of [her] protected class selected?" *Cones v. Shalala,* 199 F.3d 512, 516-17 (D.C. Cir. 2000) (finding a *prima facie* case where the employer elected to fill a position non-competitively).

Here, Ms. Woods establishes a *prima facie* case of both age and sex discrimination because, she has presented evidence that she is female and over the age of forty, that she was well qualified for the Grade 14 position, and that instead of following its own established merit promotion procedures, the EPA promoted two younger males that had been preselected for the position despite their lack of qualifications.

The Court must also reject the EPA's assertion that because Yvette Hellyer was also selected for an accretion of duties promotion, the Court should determine as a matter of law that it did not discriminate against Ms. Woods. Def. Mot. at 23. It is settled law that the mere fact that an employer has at one time treated a member of a protected group well does not preclude a finding of discrimination. *See Czekalski,* 475 F.3d at 368-69 (holding that selecting official's promotion of female plaintiff is probative evidence of the lack of discriminatory animus, but is not sufficient to keep from a jury plaintiff's claim of sex-based demotion); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1013 n. 9 (1st Cir. 1979) (noting that favorable treatment of someone from within the plaintiff's group raises issues of fact but does not disprove discrimination) (*citing Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579 (1978) (balanced workforce does not preclude finding of specific act of discrimination)).

Furthermore, there is a question of material fact as to whether Mr. Eichenwald, the alleged discriminating official, was even involved in Hellyer promotion. Ms. Pontius' original statement indicates that she alone made the decision to select Ms. Hellyer.  PX 13 (Pontius Decl.

12/2/04) at 2. *See also* PX 20, ROI Tab F-2 (Eichenwald Decl. 12/3/04) at 2 (admitting that the promotion process in Ms. Woods' case was the first he had been involved in during his four years as a manager); *accord* PX 8 (Eichenwald Depo.) at 72 (indicating he had never promoted an Environmental Protection Specialist over the career ladder prior to Dyer's promotion). The fact that Ms. Pontius has subsequently changed her testimony and claimed that Mr. Eichenwald was involved in the promotion of Ms. Hellyer (PX 19 at ¶ 7) raises a question of fact for the jury to decide which of her two versions are true. *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1234 (D.C. Cir. 1984)(weighing of conflicting evidence and the evaluation of witness credibility is exclusively within the jury's province.)

Moreover, there is also a question of material fact about whether Yvette Hellyer's promotion is a relevant comparison as she was a Biologist, not an Environmental Protection Specialist and, therefore, not similarly situated to Ms. Woods, Mr. Dyer or Mr. Ellis. PX 12. *See Barbour v. Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (whether "all of the relevant aspects" of an employment situation are "nearly identical" to those of the comparator is a question of fact for jury).

As such, it is clear that Ms. Woods has established a *prima facie* case of discrimination. Indeed, the defendant does not contest that Ms. Woods has established a *prima facie* case of discrimination. *See* Def. Mot. at 21-29.

### III.  A Reasonable Jury Could Find That Defendant Circumvented Its Merit Promotion Policy In Order To Avoid Selecting Ms. Woods Based on Her Age and Sex.

As the Supreme Court held in *Reeves*, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose,"

18

particularly because "the employer is in the best position to put forth the actual reason for its

decision." 530 U.S. at 147; *see also Salazar v. Washington Metropolitan Transit Authority*, 401

F.3d 504, 511 (D.C. Cir. 2005)(finding questions about whether the employer provided fairly

administered promotion selection process, and whether the failure to promote on grounds that

successful candidate was more qualified precluded summary). Here, EPA claims that it

promoted Mr. Dyer and Mr. Ellis without competition, because EPA policy prevented them from

holding a competition and both young men were working at the GS-14 level but Ms. Woods was

not. PX 13 (Pontius Decl.12/2/04) at 3-4 (Ms. Woods did not meet the job requirements for the

position "because she wasn't working at the GS-14 level which is the requirements for the

Accretion Promotion."); *see also* PX 15 (Smith Decl. 12/7/04) at 5. However, there is ample

evidence from which a jury could reasonably conclude that management's contentions are false.

### A.    There Are Issues of Fact Regarding EPA's Management's Assertion that it Could Not Use the Standard Merit Promotion Process.

The evidence demonstrates that the EPA selected two younger male GS-13s in the exact

same position as Ms. Woods  for a promotion to a GS-14 position without following the

competitive Merit Promotion procedures in the EPA's Merit Promotion Plan.  In doing so, the

EPA bypassed a system that provided for a fair and open competitive process for selection and

protected against discriminatory animus.  PX 18 (EPA Merit Promotion Manual) at 2-1.  The

EPA, however, has claimed that it could not utilize the standard promotion process because

"issuing a job vacancy announcement. . . would have required inviting applications from outside

of OCE, [and] was not a viable means of effecting a promotion." PX 23 (Eichenwald Decl.) at ¶¶

17-18; PX 19 (Pontius Decl. 12/29/05) at ¶ 17.  In fact, the EPA's Merit Promotion Manual

clearly states that an announcement can limit the applicant pool to "an organizational unit, no less than a division or laboratory, which is considered sufficient to attract at least two highly qualified candidates for promotion consideration." PX 18 (EPA Merit Promotion Manual) at 3-2; *see also* PX 1 at ¶ 17 (after Ms. Woods requested that any GS-14 position available to TPED be competed through an open process, Ms. Pontius assured her "that she could do that"). This means the EPA could have restricted the applicant pool to TPED employees. Other than the bald statement that they could not have a competitive selection, the EPA fails to explain why they did not follow the Merit Promotion procedure by limiting the applicant pool.

> **B.    A Reasonable Jury Could Find that Management's Assertion that It Could Promote Mr. Dyer and Mr. Ellis Without Competition Because They Were Already Working at the GS-14 Level is False.**

An "Accretion of Duties" promotion is only appropriate where the employee is already performing the basic functions of the higher graded position. PX 12 (EPA Policy Bulletin) at 1. Here, there is ample evidence that neither Dyer nor Ellis had the responsibilities of a GS-14 Environmental Protection Specialist. The Position Description (PD) for GS-14 requires the incumbent to have a "thorough knowledge of EPCRA, TSCA and FIFRA." PX 3 at 7. The PD also provides that a GS-14 should serve as the "national expert" for all three of these statutory areas. *Id.* In contrast, a GS-13 is not expected to have knowledge of all three statutory areas. *See* PX 1, Attachment D (PD for a GS-13 Environmental Protection Specialist). Additionally, a GS-14 is expected to handle "national enforcement initiatives." PX 3 at 8.

Neither Mr. Dyer nor Mr. Ellis had a thorough knowledge of all three areas or served as a national expert in any of the three areas. *See* PX 5 (Dyer Depo.) at 23-29 (acknowledging that he had never worked with EPCRA and had only worked one TSCA case); PX 4 (Ellis Depo.) at 52

20

(acknowledging his work had focused on FIFRA since 1990). Additionally, neither Mr. Dyer nor Mr. Ellis handled national level initiatives on their own. Mr. Dyer was teamed with attorney Dean Ziegel for his import/export pesticide work under TSCA. PX 5 (Dyer Depo.) at 28, 31. Mr. Ellis worked with attorney Mark Gravey on the core TSCA program. *See* PX 4 (Ellis Depo.) at 36. Accordingly, they were not already working as GS-14 Environmental Protection Specialists, and an Accretion of Duties promotion was inappropriate. *See* PX 12 (EPA Policy Bulletin) at 1.

C.    **There is an Issue of Fact Regarding Management's Current Claim that Ms. Woods Was Not Working at the GS-14 Level.**

In contrast to the two young male selectees, Ms. Woods did have the requisite expertise in all three areas enforced by TPED. PX 1 at ¶ 15 (indicating that Ms. Woods had expertise in all three of these statutory areas). *See also* PX 7 (Clark Decl.) at ¶ 3 (stating that Ms. Woods was knowledgeable in all three technical areas). Indeed, the evidence shows that as early as 1995, Ms. Woods was working at the GS-14 level. Gerald Stubbs, her then-supervisor, recommended her for a promotion to the GS-14 level based on an accretion of duties. PX 1 at ¶ 6, *see* PX 17 (Stubbs Depo.) at 64-66 (agreeing that he submitted a request for her promotion in 1995 based upon an accretion of duties).

Furthermore, a comparison of the work performed by Ms. Woods with that of Mr. Ellis and Mr. Dyer raises issues of material fact regarding the Agency's assertion that Mr. Ellis and Mr. Dyer were working at the GS-14 level and Ms. Woods was not. In addition to having expertise in all three statutory areas, Ms. Woods was serving as the national expert for two regulatory areas. PX 1 at ¶ 11; PX 6 (Handley Decl.) at ¶ 5 (stating that when he left the EPA

21

Ms. Woods took sole responsibility for a national program initiative). However, Mr. Dyer and

Mr. Ellis only served as experts in partnership with an attorney, and in only one program area.

Additionally, there is evidence that Ms. Woods had served as a Team Leader since 1990, where

she provided technical support and expertise to other staff in the office, another responsibility

listed as part of the GS-14 PD. *Compare* PX 3 at 8 ("Acts as leader for a team of Office of

Regulatory Enforcement and Office of General Counsel attorneys technical specialists....and

other staff. . .evaluates the scope of the problem and develops the team strategy....) *with* PX 1,

Attachment A (indicating that as a team leader Ms. Woods reviewed the work her team

members). While Ms. Woods had years of experience in the type of Team Leader position listed

in the GS-14 level, Mr. Ellis and Mr. Dyer did not. In fact each had served under Ms. Woods

when she was team leader. PX 1 at ¶ 4; PX 4 (Ellis Depo.) at 50 (admitting that Ms. Woods

served as his team leader); PX 5 (Dyer Depo.) at 50, 62 (admitting that Ms. Woods was his team

leader at OCM between 1991 and 1994).

### D.    A Reasonable Jury Could Find that Mr. Eichenwald's Accusations About Ms. Woods' Performance are Laced With Discrimination.

There are issues of fact regarding Mr. Eichenwald's claim that he did not promote Ms.

Woods because she "checked in" with him too often or there was some deficiency in one of her

projects. Indeed, Ms. Woods' testimony that she worked on a different floor than Mr.

Eichenwald and weeks would go by when she would not even see him (PX 1 at ¶ 19) directly

contradicts Mr. Eichenwald's claim that she checked in too much. And, Ms. Woods' testimony is

corroborated by that of Mr. Handley, who worked with Ms. Woods for over 6 years, and

observed she worked independently and consulted only when necessary. PX 6 (Handley Decl.) at

¶ 4.  As such, this contradictory testimony raises credibility issues for the jury.

A jury could also disbelieve Mr. Eichenwald's assertion that Ms. Woods did not provide quality work on a document in November of 2003.  Ms. Woods previously completed this same assignment on several occasions over a period of years without criticism and received no critical feedback on this assignment until months after its completion, i.e., when Mr. Eichenwald was called on to justify her nonpromotion.  PX 11 at 5.  Moreover, others who worked on the same assignment were not criticized for their work.  *Id.*  Additionally, this single document was only one of numerous reports Ms. Woods had prepared during the four years Mr. Eichenwald served as her supervisor, and she had never received any criticism from him about any of her other work products.  *Id.*  A jury could therefore conclude that Mr. Eichenwald's claim that Ms. Woods was not promoted because of a deficiency in her work was contrived by Mr. Eichenwald to cover his discriminatory motives for the non-selection of Ms. Woods.

Based upon this evidence, a reasonable jury could conclude that Ms. Woods was performing work at the GS-14 level at the time of her nonselection and that the Agency's assertion to the contrary is false.  The jury could then infer that the EPA's misrepresentation of Ms. Woods' qualifications, when it claimed that she was not performing at the GS-14 level but Mr. Dyer and Ellis were is a pretext for discrimination.  *See Fischbach v. D.C. Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Evidence indicating that an employer misjudged an employee's performance or qualification is, of course, relevant to the question of whether its stated reason is a pretext masking prohibited discrimination."); *Aka*, 156 F.3d at 1294-95 (plaintiff can establish pretext by showing that the "employer's explanation misstates the candidates' qualifications").

23

**IV.    A Reasonable Jury Can Infer Discrimination From Mr. Eichenwald's Ageist Remarks and Disparate Treatment.**

This Circuit has held that "[e]vidence of discriminatory statements or attitudes on the part of the employer" may preclude summary judgment in a discrimination case. *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006); *Kordel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984) (Age-related comments are "certainly probative of discriminatory motive."); *Cuddy v. Carmen*, 694, F.2d 853, 858 (D.C. Cir. 1982) (In ADEA cases the plaintiff need only prove that "age made a difference in the employer's decision.").  Here, there is ample evidence of Mr. Eichenwald's ageist and sexist attitude.

Mr. Eichenwald actually commented to Ms. Woods that she and another older female employee were from a "different era with different work ethics." PX 1 at ¶ 22.  Indeed, he noted that she and the other older female employee checked in with him more than "younger TPED staffers," an alleged observation that later morphed into one of his reasons for not promoting Ms. Woods.  Mr. Eichenwald also laughingly made a comment to Ms. Woods referencing her age. *Id.*  From his own words, a jury could conclude that age played a role in Mr. Eichenwald's decision not to recommend Ms. Woods for the promotion.

Similarly, Mr. Eichenwald's favoritism toward his younger male subordinates also supports an inference that a discriminatory animus influenced his decision to promote younger males instead of Ms. Woods. *See Parker v. U.S. Dept. of Housing and Urban Development*, 891 F.2d 316, 321 (D.C. Cir. 1989) (Evidence identified as relevant to demonstrating pretext includes: "(2) facts as to the employer's treatment of plaintiff during the term of employment; and (3) the employer's general policy and practice with respect to employment of minorities and

24

women."); *see also Townsend v. Washington Metropolitan Area Transit Auth.*, 746 F.Supp. 178,

185 (D.D.C. 1990) (concluding that a "discriminatory atmosphere" can be circumstantial proof of

individualized discrimination).  Mr. Eichenwald consistently favored his younger male

employees in TPED over his female employees by including them in meetings and briefings

while excluding female staff, more freely allowing male staff to work from home as part of their

Flexiplace agreement, assigning female staff more administrative tasks, and being disrespectful

to his female Associate Director.  PX 1 at ¶¶ 24-27.  Ms. Clark, another older female working in

TPED, has also stated that Mr. Eichenwald treated her with less respect than younger male

employees.  PX 7 (Clark Decl.) at ¶ 4 (stating that Eichenwald frequently interrupted her but did

not interrupt male employees).  Moreover, Mr. Eichenwald explicitly expressed his age-bias.  For

instance, when his three younger male employees were absent, Mr. Eichenwald sent out an e-

mail to the remaining staff in the division (both females and older employees) indicating that the

division would "collapse" without these three younger male employees in the office.  PX 1,

Attachment F.  Mr. Eichenwald's statements and disparate treatment are more than sufficient to

create an issue of fact regarding his motive for not promoting Ms. Woods.

**V.    A Reasonable Jury Could Find that EPA Retaliated Against Ms. Woods By Refusing To Approve Her Flexiplace Request.**

To establish a *prima facie* case of unlawful retaliation, a plaintiff must show only that: (1)

she engaged in statutorily protected activity; (2) her employer took an action against her, which

might have dissuaded her from engaging in the protected activity if she had known it would be

the consequence of her activity; and (3) a causal connection exists between the protected activity

and the negative action or actions. *Burlington Northern*, 126 S.Ct. at 2412; *Carney v. The*

*American University*, 151 F.3d 1090, 1095 (D.C. Cir 1998). "[T]his initial burden is not great. Plaintiff merely needs to establish facts adequate to permit an inference of retaliatory motive." *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). Defendant admits that it reacted adversely to Ms. Woods' protected activity, but contends that Ms. Woods cannot meet the second prong of her *prima facie* case, i.e., its retaliatory delay of the approval of her flexiplace request was not sufficiently harmful to be actionable.

Yet, the Supreme Court has held that an employer's failure to consider an employee for any contractual benefit of employment is actionable. *Hishon v. King & Spaulding*, 467 U.S. 69, 74 (1984). In *Hishon*, a female associate claimed that her employer failed to consider her for partnership because of her sex in violation of Title VII. *Id.* at 74-75. The Court held that if the law firm had contractually promised to consider the associate for partnership, then the failure to consider her for partnership "without regard to sex" would violate Title VII. *Id.* at 75 ("If the evidence at trial establishes that the parties contracted to have peitioner considered for partnership, that promise clearly was a term, condition, or privilege of her employment. Title VII would then bind respondent to consider petitioner for partnership as the statute provides, i.e., without regard to petitioner's sex."). Thus, an employer's refusal to follow through with a contractual promise to an employee is actionable. *Id.*

Here, EPA made a written, contractual promise to consider Ms. Woods for participation in the flexiplace program. In October 1998, EPA entered into a written contract with the American Federation of Government Employees to consider its members (of which Ms. Woods was one) for participation in the flexiplace program within fifteen days of application. *See* PX 26 (EPA Memorandum on Bargaining Agreement for flexiplace Leave) at 8 ("The employee will

submit the attached application for performing work at the AWL. . . .[t]he decision will be

provide to the applicant in writing as soon as possible, normally within 15 calendar days.").

Flexiplace days are a benefit given to employees which permits them to work at an alternative

work location other than their official work station as long as their work is portable. *Id.* at 2.

Many employees in TPED had been given permission to take permanent flexiplace days. *See* PX

1 (Woods Decl. 2/10/06) at ¶ 29 (stating that other employees were regularly allowed this

benefit); PX 23 (Eichenwald Decl.1/10/06) at ¶ 19 (stating that a number of TPED employees

worked from home). Ms. Woods requested flexiplace on April 28, 2004. PX 22 (Flexiplace

Leave Form Dated 4/28/04). She sent inquiries to her supervisor on May 20 and June 3, but

received no response. Indeed, it was not until she added this refusal to consider her for flexiplace

leave to her EEO complaint that the EPA considered her application. Thus, she was denied the

contractual benefit of timely consideration for flexiplace leave.

      The Supreme Court's decision in *Burlington Northern and Santa Fe Ry. Co. v. White,*

____ U.S. ___ , 126 S.Ct. 2405 (2006) supports a finding that the delay in consideration for

flexiplace participation is actionable. There, the Court made clear that the anti-retaliation

provisions of Title VII prohibit actions by an employer that "might have dissuaded a reasonable

worker from making or supporting a charge of discrimination." *Id.* at 2415. More specifically,

the Court held that requiring an employee to perform more arduous duties "would have been

materially adverse to a reasonable employee" and thus might dissuade a reasonable worker from

complaining of discrimination. *Id.* at 2407-08. Likewise, requiring Ms. Woods to spend more

time and effort commuting to work than those who did not complain of discrimination might

dissuade a reasonable worker from making such a complaint. Thus, in addition to depriving Ms.

Woods of a contractual benefit, the EPA caused her objectively tangible harm by significantly delaying her participation in the flexiplace program.

## CONCLUSION

Based upon the evidence, a reasonable jury could reject the EPA's claim that Ms. Woods was denied promotion because two younger colleagues were doing grade 14 work and she was not and that due to a hiring freeze the EPA could not allow her to compete for promotion under its Merit Promotion Plan, and conclude that the denial of promotion was the product of discrimination. *Reeves* 530 U.S. at 148 ( "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). This evidence, coupled with evidence of Mr. Eichenwald's ageist comments and his favoritism of the younger male employees, all raise issues of fact for the jury about whether that Ms. Woods was not selected for the promotion because of discriminatory animus. Accordingly, defendant's motion for summary judgment must be denied.

Respectfully Submitted,

/s/ *David H. Shapiro*

DAVID H. SHAPIRO
D.C. BAR No. 961326
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W., Suite 1290
Washington, DC  20005
Tel. 202-842-0300

Dated: January 7, 2008

28