UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REBECCA L. WOODS, )<br>)<br>Plaintiff, )<br>)<br>V. )<br>)<br>STEPHEN L. JOHNSON, )<br>  Administrator, Environmental )<br>  Protection Agency, )<br>)<br>Defendant. )<br>                                     ) | Civil Action No. 06-1460 HHK |

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES

Pursuant to Local Rule 7.1(h), plaintiff Rebecca L. Woods (hereinafter "Woods") hereby submits her statement of genuine issues in response to the "Statement of Material Facts Not in Dispute" filed by defendant in support of its Motion for Summary Judgment.

I.      **General Response to Defendant's Statements.**

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Mitchell v. DCX, Inc.*, 274 F.Supp.2d 33, 39 (D.D.C. 2003). In a discrimination action such as this, the material issues are the defendant's motives, whether defendant took adverse employment actions against Woods, and the legitimacy of any alleged non-discriminatory reasons for those actions. Yet, for the most part, the facts recited in defendant's statement are not "material" to these issues. Thus, even if those facts are accepted, they do not entitle defendant to judgment. *See United States v. Winstead,* 74 F.3d 1313, 1320 (D.C.Cir. 1996) ("material fact" defined as "a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction"). As such, defendant's

statements do not satisfy the requirement of Local Rule 7(h) that defendant provide, "a statement of *material* facts as to which the moving party contends there is no genuine issue." Therefore, Defendant's Motion for Summary Judgment must be denied.

## II.     Genuine Issues of Fact.

*1.     Whether Woods was performing at a GS-14 level.*

There is substantial evidence that Ms. Woods met the requirements for a GS-14 Environmental Protection Specialist position according to the Position Description. She served as a National Expert for FIFRA, TSCA, and EPCRA. *See* Plaintiff's Exhibit (hereinafter "PX") 3, ROI Tab F-7 at 7, 10 ( Position Description indicating that the incumbent serves as a national expert for FIFRA, TSCA, and EPCRA and must have "a thorough knowledge of EPCRA, FIFRA, and TSCA."); PX 6 (Handley Decl.) at ¶ 3 (James Handley, a GS-14 attorney, states that Ms. Woods knew more than he did about TPED's enforcement regulations); PX 7 (Clark Decl.) at ¶ 2 (Kathy Clark, a GS-15 attorney, states that she frequently asked Ms. Woods questions about TPED enforcement regulations because Ms. Woods was extremely knowledgeable in all three areas). Ms. Woods also met the leadership requirements outlined in the Position Description for a GS-14, having served as a Team Leader, Acting Branch Chief, and handling two program initiatives without attorney guidance. *See* PX 3 at 8 (Position Description noting that a GS-14 "acts as a leader for a team of Office of Regulatory Enforcement and Office of General Counsel attorneys, technical specialists . . . and other staff . . . to develop team strategy"); PX 1, ¶ 5 (indicating that Woods served as a Team Leader); *id.*, Attachment C (showing that Ms. Woods served as Acting Branch Chief and Acting Division Director); *see also* PX 5 (Dyer Depo.) at 63-64 (indicating that Ms. Woods had served as Acting Branch Chief).

Her former supervisor recognized that she was working at the GS-14 level as early as 1995. *Id.* at ¶ 6; PX 20 (Stubbs Depo.) at 64-66 (agreeing that he submitted a request for her promotion in 1995 based upon an accretion of duties). However, despite her ever-expanding duties, excellent evaluations, and numerous performance awards, she has repeatedly been turned down when she sought a promotion to the GS-14 level. PX 1 at ¶¶ 2, 6 & Attachment D (Summary of Work and Duties and Listing of Honors).

  2. *Whether TPED circumvented the Merit Promotion System when it chose Dyer and Ellis to fill two vacant positions instead of using a competitive process.*

TPED decided to promote Brian Dyer and Tony Ellis, both younger, male GS-13 Environmental Protection Specialists, to a GS-14 level even before the positions were officially available once it appeared that there would be an opportunity to promote subordinates to the Grade 14 because of buyouts. *See* PX 23 (Eichenwald Decl. 1/10/06) at ¶ 9 ("In anticipation of promotional opportunities that might occur after the buyouts, I, Gerald Stubbs, Ann Pontius, and Stephanie Brown caucused and concluded that Brian Dyer and Tony Ellis were the two best qualified TPED employees."). Instead of convening a panel to review applications and conduct interviews, management "caucused" and, instead of following selection protocol, management "concluded" that the two young men would be selected. *Id.*; PX 28 at 1 (admitting that the "selection process was an informal one; there was no vacancy announcement issued, there was no scoring system, nor were any written materials considered or generated incident to the process.").

      3.      *Whether Dyer and Ellis were given valid GS-14 accretion of duties promotions.*

        a.      *Whether the two vacancies called for accretion of duties promotions.*

An accretion of duties promotion is appropriate where an employee is already performing at the next grade level. A competitive selection is required where there is more than one qualified candidate who may fill a vacant position. Here, the EPA admits that when it preselected the two individuals for the GS-14 positions, it *compared* the qualifications of all six eligible TPED employees instead of looking to see which employees were already working at the GS-14 level. *See* PX 23 (Eichenwald Decl. 1/10/06) at ¶ 10 ("The TPED management team . . . considered all six of the Division's promotion eligible non-attorney GS-13s"); PX 19 (Pontius Decl. 12/29/05) at ¶ 8 ("Based on the input I received from my Branch Chiefs...I concluded that Mr. Ellis and Mr. Dyer were significantly better qualified for the GS-14 promotions than any other TPED non-attorney GS-13 personnel."). If Dyer and Ellis had actually been given an accretion of duties promotion, the inquiry would not have been whether they were more qualified for promotions than the other non-attorney GS-13s in TEPD, but whether they deserved a promotion to the GS-14 level because they had taken on, "additional duties and responsibilities." *Id.,* Ch.3, ¶ 1.b.(1)b. at 3-1. Furthermore, Mr. Eichenwald admits that he first orally recommended the promotion of Mr. Dyer over the others in his section and then wrote an accretion of duties justification which Ms. Smith and Mr. Harris then signed. PX 8 (Eichenwald Depo.) at 62-64.

        b.      *Whether Dyer and Ellis were already performing at the GS-14 level.*

The primary reason Ms. Pontius gives for Mr. Dyer's and Mr. Ellis' selection is "because they [Dyer and Ellis] had already demonstrated an ability to work at the GS-14 level." PX 13,

ROI Tab F-3 (Pontius Decl. 12/2/04) at 3-4. However, an accretion of duties promotion requires not only an ability to work at the next level, but that the incumbent has actually been performing the duties at that level. PX 12 at 1 (EPA Policy Bulletin providing that an "Accretion of Duties" promotion is only appropriate where the employee is already performing the basic functions of the higher graded position).

The record reveals Dyer and Ellis were not performing at the GS-14 level prior to their promotions. Neither Mr. Dyer nor Mr. Ellis had experience or technical knowledge in all three statutory areas enforced by TPED. *See* PX 5 (Dyer Depo.) at 23-29 (admitting that he had never worked with EPCRA, and handled only one case under TSCA); PX 4 (Ellis Depo.) at 52 (agreeing that his work centered on TSCA since 1990). Additionally, neither Mr. Dyer nor Mr. Ellis handled national level programs on their own. Mr. Dyer was teamed with attorney Dean Ziegel for his import/export pesticide work under TSCA. PX 5 (Dyer Depo.) at 28, 31. Mr. Ellis worked with attorney Mark Gravey on the core TSCA program. *See* PX 4 (Ellis Depo.) at 36.

  4.  *Whether EPA policy permitted a competitive promotion for the two vacancies.*

TPED management has tried to justify its failure to follow the Merit Promotion Plan by asserting that there was no "position" available, and, therefore, it had no position to fill and could not post a vacancy. *See* PX 19, (Pontius Decl. 12/29/05) at ¶ 17 ("TPED...did not have authorization to hire new personnel and...announcing a job publicly and soliciting interest from a community outside of TPED would have been inappropriate in such circumstances."); PX 23 (Eichenwald Decl.) 1/10/06, at ¶ 17 ("TPED did not have authorization to hire new personnel, and . . . announcing a job publically within TPED or soliciting interest from a larger group

5

outside of TPED is not permitted without a full-time equivalent slot to hire into."). However, EPA's Merit Promotion Manual states that a vacancy announcement can limit the applicant pool to "an organizational unit, no less than a division or laboratory, which is considered sufficient to attract at least two highly qualified candidates for promotion consideration." PX 18 (EPA Merit Promotion Manual) at 3-2; *see also* PX 1 at ¶ 17 (after Ms. Woods requested that any GS-14 position available to TPED be competed through an open process, Ms. Pontius assured her "that she could do that"). Thus, there is a question of fact regarding whether management could have used the competitive promotion process without increasing the number of employees in the unit.

    5.    *Whether the reasons given by Mr. Eichenwald for not promoting Ms. Woods are true.*

Mr. Eichenwald gave Ms. Woods two reasons for her nonselection. First, he told her that she "checked in too much." PX 1 at ¶ 8. Previously, Mr. Eichenwald had commented to Ms. Woods that "younger TPED staff" did not check in as much as Ms. Woods and Mary McDonnell, the two staff personnel in the division who had worked for the government more years than anyone else. *Id.* at ¶ 9; *accord id.* at ¶ 22. However, "weeks" would sometimes go by when Ms. Woods would not see her branch chief since they worked on different floors, and on average, Ms. Woods only stopped by Mr. Eichenwald's office once every two weeks. *Id.* at ¶ 19. Additionally, although Ms. Woods had worked under Mr. Eichenwald for four years, he had never told her that she checked in too much at any time. PX 10 (Woods Decl.) 7/20/04 at ¶ 9. Moreover, James Handley, an EPA attorney who worked with Ms. Woods for years, observed that Ms. Woods worked independently only "consulting when necessary." PX 6 (Handley Decl.) at ¶ 4.

Mr. Eichenwald's second stated reason for not promoting Ms. Woods was that "a work product she had prepared in November of 2003 was 'not a quality document.'" PX 1 at ¶ 19. However, Ms. Woods had followed Mr. Eichenwald's instructions for this project, turned in the assignment by the deadline set by him, and had received no negative feedback until Mr. Eichenwald sought to justify her nonpromotion three months after the fact. Moreover, Ms. Woods had completed this type of project several times in the past, and her work had always been found to be of high quality. *Id.* Additionally, others had worked on the project and submitted less information than Ms. Woods, but their work was never criticized. *Id.*

      6.      *Whether Ms. Woods was working at the GS-14 level.*

Later, the EPA sought to justify Ms. Woods' nonpromotion by claiming that she was not working at the GS-14 level. There is a question of fact about whether this is true. Following her reassignment to the Eastern Branch in 2000, Ms. Woods' responsibilities continued to increase. James Handley, with whom she had worked on the AHERA TSCA since 1995, left the Agency in 2000 or 2001. Following his departure, she handled that national program by herself. PX 1 at ¶ 13; PX 6 (Handley Decl.) at ¶¶ 2, 5. Additionally, when Tom Marvin, the attorney assigned to EPCRA 313 went on detail in 2001, Ms. Woods also singlehandedly ran the EPCRA program. PX 1 at ¶ 12; *see also* PX 24, ROI Tab B at 25 (Justification for Monetary Award) (indicating that Ms. Woods was in charge of the EPCRA program while Mr. Marvin was on detail). Although it was unusual for an Environmental Protection Specialist to oversee a program area without an attorney partner, Ms. Woods was given sole responsibility for two national level programs. PX 1 at ¶ 12. Mr. Carl Eichenwald, who had become Ms. Woods' supervisor, was well aware that Ms. Woods had sole responsibility for these national level programs, yet he did

not assign another attorney to work with her. PX 1 at ¶¶ 12,13. Indeed, he praised her for her independent work on these national initiatives. *Id.*; *see also* PX 8 (Eichenwald Depo.) at 34-36 (admitting that most employees under his supervision had not done TSCA Asbestos work or EPCRA work like Ms. Woods); PX 2 (Pontius Depo.) at 91 (acknowledging that after Mr. Marvin left the EPA in 2003, no attorney was assigned to work with Ms. Woods and that EPCRA 313 is "an important program").

The primary reason Ms. Pontius gives for Mr. Dyer's and Mr. Ellis' selection is "because they [Dyer and Ellis] had already demonstrated an ability to work at the GS-14 level." PX 13, ROI Tab F-3 (Pontius Decl. 12/2/04) at 3-4. However, Ms. Pontius admitted in her deposition that Ms. Woods was working at the GS-14 level. PX 2 (Pontius Depo.) at 81, 89; *see also* PX 7 (Clark Decl.) (stating that she has worked with Ellis, Dyer, and McDonnell, and based on her experience working with these Environmental Protection Specialists, she does not understand why these individuals are higher graded than Ms. Woods.).

    7.    *Whether Mr. Eichenwald is age and sex biased.*

Mr. Eichenwald commented that his older staff, including Ms. Woods, checked in more than his younger employees and was from a "different era with different work ethics." PX 1 at ¶ 22. He also favored his younger male staff by including them in meetings and briefings while excluding female staff, more freely allowing male staff to work from home as part of their flexiplace agreements, assigning female staff more administrative tasks, and by being disrespectful to his female Associate Director. *See id.* 1 at ¶¶ 24-27; PX 7, Clark Decl. (stating that Mr. Eichenwald frequently interrupted Ms. Clark's presentations or briefings to the Office or Associate Office Directors while he did not interrupt male employees). Mr. Eichenwald also

8

frequently attended all male coffee hours in Mr. Ellis' office, a gathering to which no female staff member was ever included. PX. 1 at ¶ 23. And, when three of his younger male employees were sent out for the day he out an e-mail entitled "Bring out your dead" with the written text "my division collapses around me." *See id.*, Attachment F.

    8.    *Whether the refusal to allow Ms. Woods a benefit routinely granted to other TPED employees constitutes material harm.*

On April 28, 2004, Ms. Woods submitted an application to Mr. Eichenwald requesting Thursdays as her permanent flexiplace day. PX 22 (Flexiplace Leave Form Dated 4/28/04). "Flexiplace" days are a benefit given to employees which permits them to work at an alternative work location other than their official work station as long as their work is portable. PX 23 at 2; PX 1 at ¶ 29; PX 23 (Eichenwald Decl.) 1/10/06, at ¶ 19 (stating that TPED employees were allowed to work from home). The EPA's Memorandum is a contract requiring a supervisor to respond to an employee's flexiplace request in writing within fifteen calendar days. PX 26 (EPA Memorandum on Bargaining Agreement for Flexiplace Leave) at 8. Mr. Eichenwald did not respond to Ms. Woods' request. It was not until she added this refusal to consider her for flexiplace leave to her EEO complaint that the EPA considered her application. Thus, by failing to respond to her repeated requests, Mr. Eichenwald denied her the contractual benefit of timely consideration for flexiplace leave.

Because of the delay, Ms. Woods was required to spend more time and effort commuting to work than those who did not complain of discrimination. Thus, in addition to depriving Ms. Woods of a contractual benefit, the EPA caused her objectively tangible harm by significantly delaying her participation in the flexiplace program.

### III. Specific Responses to "Defendant's Statement of Material Facts as to Which There Is No Genuine Issue."

Most of the statements listed in "Defendant's Statement of Material Facts as to Which There Is No Genuine Issue" do not address these material questions, but merely mention background information or restate the claims of defense witnesses. To the extent that defendant's statements touch on the material facts in this case, there is ample evidence to dispute those.

**Statement No. 2:** Ann Pontias [sic], Director of TPED, consulted with her management team including Carl Eichenwald, Gerry Stubbs, and Stephanie Brown, Associate Director, regarding promotions based on the availability of the GS-14 positions.

**Response: Objection/ In Dispute.**

The plaintiff objects to this statement because the defendant does not indicate when they claim Ms. Pontius consulted with her management team regarding promotions based on the availability of the GS-14 positions.

However, the plaintiff disputes that Ann Pontius consulted with her team regarding promotions based on the availability of the GS–14 positions. Even before the positions were officially available, when it appeared that there would be an opportunity to promote subordinates to the Grade 14 because of buyouts of long-term EPA employees, TPED decided to promote Brian Dyer and Tony Ellis, both younger male GS-13 Environmental Protection Specialists, to a GS-14 level. *See* PX 23 (Eichenwald Decl. 1/10/06) at ¶ 9 ("In anticipation of promotional opportunities that might occur after the buyouts, I, Gerald Stubbs, Ann Pontius, and Stephanie Brown caucused and concluded that Brian Dyer and Tony Ellis were the two best qualified TPED employees."). Because it had already been determined that Dyer and Ellis would receive the two

10

GS-14 slots, when TPED received notification that GS-14 positions were available, Mr. Eichenwald, as Acting Director for Ms. Pontius, and in his capacity as Branch Chief, recommended Mr. Dyer and Mr. Ellis, thereby securing their promotions. [PX 20 (Eichenwald Decl.) at 7; PX 15 (Smith Decl.) at 4.] After providing these recommendations orally, Mr Eichenwald then wrote the justification for Mr. Dyer's promotion after-the-fact based on a claimed accretion of duties which Ms. Smith then signed. PX 8 (Eichenwald Depo.) at 62-64. Phyllis Harris, Deputy Assistant Administrator, signed off on the accretion of duties promotions based on the ad hoc written justifications. *Id.* at 102.

**Statement No. 3**: Tony Ellis, who worked in the Western Branch, and Brian Dyer, who worked in the Eastern Branch, both in the TPED, were recommended for promotion. The management team reached a consensus conclusion that these two individuals deserved "accretion of duties" promotions based on their performance.

**Response: In dispute.**

Plaintiff disputes that the management team reached a consensus conclusion that Dyer and Ellis deserved an "accretion of duties" promotion. The management team could not have determined that Ellis and Dyer deserved an "accretion of duties" promotion, because the proper procedures for promoting an employee due to an accretion of duties were not followed. The EPA admits that when it preselected the two individuals for the GS-14 positions, it compared eligible TPED employees instead of looking to see which employees were already working at the GS-14 level. *See* PX 23 (Eichenwald Decl. 1/10/06) at ¶ 10 ("The TPED management team... considered all six of the Division's promotion eligible non-attorney GS-13s"); PX 19 (Pontius Decl. 12/29/05) at ¶ 8 ("Based on the Input I received from my Branch Chiefs . . . I concluded

11

that Mr. Ellis and Mr. Dyer were significantly better qualified for the GS-14 promotions than any other TPED non-attorney GS-13 personnel"). If Dyer and Ellis had actually been given accretion of duties promotions, the inquiry would not have been whether they were more qualified for promotions than the other non-attorney GS-13s in TEPD, but whether they deserved a promotion to the GS-14 level because they had taken on "additional duties and responsibilities." *Id.,* Ch.3, ¶ 1.b.(1)b. at 3-1.

Furthermore, unlike Ms. Woods, Dyer and Ellis were not performing at the GS-14 level, and therefore neither should have received an accretion of duties promotion. Neither Mr. Dyer nor Mr. Ellis had experience or technical knowledge in all three statutory areas enforced by TPED. *See* PX 5 (Dyer Depo.) at 23-29 (admitting that he had never worked with EPCRA, and handled only one case under TSCA); PX 4 (Ellis Depo.) at 52 (agreeing that his work centered on TSCA since 1990). Additionally, neither Mr. Dyer nor Mr. Ellis handled national level programs on their own. Mr. Dyer was teamed with attorney Dean Ziegel for his import/export pesticide work under TSCA. PX 5 (Dyer Depo.) at 28, 31. Mr. Ellis worked with attorney Mark Gravey on the core TSCA program. *See* PX 4 (Ellis Depo.) at 36.

The record reveals evidence that the reasons that the EPA have provided for giving Dyer and Ellis "accretion of duties" promotions are pretext for discrimination against Ms. Woods. The evidence demonstrates that the EPA selected two younger male, GS-13s in the exact same position as Ms. Woods, for a promotion to a GS-14 position without following the competitive Merit Promotion procedures in the EPA's Merit Promotion Plan. After providing the recommendations orally, Mr Eichenwald wrote the justification for Mr. Dyer's promotion after-the-fact based on a claimed accretion of duties which Ms. Smith then signed. PX 8 (Eichenwald

Depo.) at 62-64. Phyllis Harris, Deputy Assistant Administrator, signed off on the accretion of duties promotions based on the ad hoc written justifications. *Id.* at 102. In doing so, the EPA bypassed a system that provided for a fair and open competitive process for selection and protected against discriminatory animus. PX 18 at 2-1.

In addition to the fact that the EPA failed to treat Ms. Woods' in manner comparable to two younger male employees, there is evidence that on several occasions Mr. Eichenwald, who was a prime mover in the decision to promote the younger males instead Ms. Woods, made inappropriate references to Ms. Woods' age. *See* PX 1 at ¶ 22. These ageist comments raise the inference that age played a role in Mr. Eichenwald's decision to recommend Mr. Dyer over Ms. Woods. This contradicts the statement of defendant that the real reason Ms. Woods was not given the GS-14 promotion was because the management team determined that Dyer and Ellis deserved the accretion of duties promotion.

Furthermore, Ms. Woods has observed that Mr. Eichenwald favored his younger males employees in TPED over his female employees by including them in meetings and briefings while excluding female staff, more freely allowing male staff to work from home as part of their flexiplace agreement, assigning female staff more administrative tasks, and that he was disrespectful to his female Associate Director. PX 1 at ¶¶ 24-27. Ms. Clark, another older female working in TPED, has also stated that Mr. Eichenwald treated her with less respect than younger male employees. PX 7 at ¶ 4 (stating that Eichenwald frequently interrupted her but did not interrupt male employees). Moreover, Mr. Eichenwald has explicitly expressed his bias favoring his younger male employees when on a day that all three of his younger male employees were absent, he sent out an e-mail to the remaining staff in the division indicating that the

division would "collapse" without these three younger male employees in the office. PX 1, Attachment F. The fact that Mr. Eichenwald commented that Ms. Woods was from a "different era with different work ethics," that she and another older female employee checked in with him more than "younger TPED staffers," and that Mr. Eichenwald laughingly made a comment to Ms. Woods referencing her age, PX 1 at ¶ 22, raises the inference that Mr. Eichenwald discriminated against her based on her age.

**Statement No. 4**: Based on the management team's discussion, Ms. Pontias [sic] made a recommendation to Walker Smith, Office Director of the Office of Regulatory Enforcement, Office of Enforcement and Compliance and Assurance ("OECA"), that Messrs. Dyer and Ellis be promoted.

**Response: In dispute.** *See* Response to Statement No. 3.

**Statement No. 5**: Ms. Smith agreed with Ms. Pontias' [sic] assessment regarding the promotions.

**Response: In dispute.**

First, it is immaterial who agreed with the assessment that Dyer and Ellis deserved the GS-14 promotions. EPA violated the EPA Merit Promotion Program, which requires that "applicants be evaluated, considered, and selected on the basis of merit" when it failed to post a vacancy announcement, convene a selection panel, review applications, or interview applicants. PX 18, EPA Merit Promotion Manual, Ch. 1, ¶ 3 at 1-1.

Second, the plaintiff disputes that anyone in TPED determined that Dyer and Ellis deserved "accretion of duties" promotions. *See* Response to Statement No. 3.

**Statement No. 6**: As for Plaintiff, Mr. Eichenwald, Ms. Pontias [sic] and Ms. Walker had similar assessments of her work. Mr. Eichenwald stated that Plaintiff

14

> performed well and was successful at a GS- 13 level, but did not have the independence or representational aspects called for at the GS-14 level. Ms. Pontias [sic] stated that Plaintiff was doing solid GS-13 work but simply wasn't doing GS-14 level work. Ms. Smith also believed that, while Plaintiff did good work, she didn't rise to the level of taking responsibility in the way a GS-14 should.

**Response: In Dispute.**

The plaintiff disputes that she was not promoted because the management team determined that she was not performing at the GS-14 level. The record reflects that Ms. Woods' duties and responsibilities were the equivalent of a Grade 14 employee since 1995. The Position Description (PD) for a GS-14 Environmental Protection Specialist indicates that the incumbent serves as a national expert for FIFRA, TSCA, and EPCRA and must have "a thorough knowledge of EPCRA, FIFRA, and TSCA." PX 3 at 7, 10. The PD also notes that a GS-14 "acts as a leader for a team of Office of Regulatory Enforcement and Office of General Counsel attorneys, technical specialists...and other staff...to develop team strategy" and handles "national enforcement initiatives." *Id.* at 8.

Ms. Woods met the requirements for a GS-14 employee. She served as a National Expert For FIFRA, TSCA, and EPCRA. In 1996, Ms. Woods partnered with attorney James Handley and worked on FIFRA enforcement and the Asbestos Hazard Emergency Response Act (AHERA) under TSCA. PX 6 (Handley Decl.) at ¶ 3 (James Handley, a GS-14 attorney states that Ms. Woods knew more than he did about TPED's enforcement regulations). In approximately 1999, she also began working on the EPCRA 313 Community-Right-To-Know program. Thus, as of 1999, she served as the national expert for FIFRA, TSCA, and EPCRA, which is a noted requirement for a GS-14 Environmental Protection Specialist. PX 1 at ¶ 14; PX

7 (Clark Decl.) at ¶ 2 (Kathy Clark, a GS-15 attorney states that she frequently asked Ms. Woods questions about TPED enforcement regulations because Ms. Woods was extremely knowledgeable in these areas). Moreover, Ms. Pontius admitted that Ms. Woods was working at a "higher level" than her GS-13 position. PX 2 at 89.

Because Ms. Woods was working at the GS-14 level, Mr. Stubbs recommended that Ms. Woods be promoted to the GS-14 level in 1995. PX 1 at ¶ 6; PX 20 (Stubbs Depo.) at 64-66 (agreeing that he submitted a request for her promotion in 1995 based upon an accretion of duties). However, despite her expanded duties, excellent evaluations, and numerous performance awards, she has repeatedly been turned down when she sought a promotion to the GS-14 level. PX 1 at ¶¶ 2, 6 and Attachment D (Summary of Work and Duties and Listing of Honors).

**Statement No. 9:**   In or around April 2004, Plaintiff submitted an application to participate in the Agency's Flexiplace program. Plaintiff does not recall actually speaking to Mr. Eichenwald about the status of her application.

**Response: In dispute.**

First, the plaintiff disputes the suggestion that she may not have followed up with Mr. Eichenwald after first requesting flexiplace. Ms. Woods requested flexiplace on April 28, 2004. PX 22 (Flexiplace Leave Form Dated 4/28/04), However, Mr. Eichenwald did not respond to Ms. Woods's request. After not receiving a response from Mr. Eichenwald for over three weeks, Ms. Woods e-mailed him on May 20, 2004, asking him about her request. PX 25. Mr. Eichenwald again failed to respond. PX 1 at ¶ 31. The same thing happened two weeks later when Ms. Woods followed up with another e-mail, PX 26, to Mr. Eichenwald on June 3, 2004, and once

again she received no response from Mr. Eichenwald. PX1 at ¶ 31. Indeed, it was not until she added this refusal to consider her for flexiplace leave to her EEO complaint that the EPA considered her application.

      Furthermore, whether Ms. Woods recalls discussing her request for flexiplace with Mr. Eichenwald after she first requested it is immaterial. It is undisputed that Mr. Eichenwald delayed responding to Ms. Woods' request for flexiplace. By failing to respond to her repeated requests, Mr. Eichenwald denied her the contractual benefit of timely consideration for flexiplace leave. Because of the delay, Ms. Woods was required to spend more time and effort commuting to work than those who did not complain of discrimination – a situation that might dissuade a reasonable worker from making such a complaint. Thus, in addition to depriving Ms. Woods of a contractual benefit, the EPA caused her objectively tangible harm by significantly delaying her participation in the flexiplace program.


**Statement No. 10:**    Plaintiff's Flexiplace application was approved. Neither Plaintiff's salary nor her benefits were adversely impacted by the time period taken to process her application.

**Response: In dispute.**

      By failing to respond to her repeated requests, Ms. Woods was deprived of a benefit of her employment by Mr. Eichenwald. The failure to timely approve her flexiplace application required Ms. Woods to spend more time and effort commuting to work than those who did not

complain of discrimination. Thus, in addition to depriving Ms. Woods of a contractual benefit, the EPA caused her objectively tangible harm by significantly delaying her participation in the flexiplace program.

**Statement No. 11**: On or around July 20, 2004, Plaintiff requested that her complaint be amended to include a retaliation claim based on denial of her request for flexiplace.

**Response: Immaterial.**

The timing of Ms. Woods' decision to amend her complaint is immaterial. Ms. Woods amended her complaint because Mr. Eichenwald's failure to approve her request for flexiplace was retaliatory. The EPA's Memorandum regarding the procedure for receiving flexiplace approval requires a supervisor to respond to an employee's request in writing within fifteen calendar days of receiving that request. PX 26 (EPA Memorandum on Bargaining Agreement for Flexiplace Leave) at 8 ("The employee will submit the attached application for performing work at the AWL . . . . [t]he decision will be provide to the applicant in writing as soon as possible, normally within 15 calendar days."). However, Mr. Eichenwald did not a respond to Ms. Woods's request even after she followed up with him three times. After not receiving a response from Mr. Eichenwald for over three weeks, Ms. Woods e-mailed him on May 20, 2004, asking him about her request. PX 25. Mr. Eichenwald again failed to respond. PX 1 at ¶ 31. The same thing happened two weeks later when Ms. Woods followed up with another e-mail, PX 25, to Mr. Eichenwald on June 3, 2004, and once again she received no response from Mr. Eichenwald. PX 1 at ¶ 31. It was not until she added this refusal to consider her for flexiplace leave to her EEO complaint that the EPA considered her application.

**Statement No. 12:** In the fall of 2005, Plaintiff started a detail in the Office of Pollution, Prevention and Toxics. The detail was initially set for a 120 day period, but was extended such that the detail lasted over one year. The detail ended in the latter part of 2006 at which time Plaintiff was permanently selected for a position in the new National Programs Chemical Division.

**Response: Immaterial.**

The acts of discrimination and retaliation that are the subject of Ms. Woods' Complaint took place prior to the fall of 2005 while she was still working in TEPD. What took place once Ms. Woods left TEPD is not material to her claims of discrimination or retaliation. Moreover, the National Programs Chemical Division position is still a Grade 13 position.

Respectfully Submitted,

/s/ David H. Shapiro
DAVID H. SHAPIRO
D.C. BAR No. 961326
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W., Suite 1290
Washington, DC 20005
Tel. 202-842-0300

Dated: January 7, 2008